[No. A128973. First Dist., Div. One. Apr. 30, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
CHAD ANDREW LARSEN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., and V.

COUNSEL

Philip M. Brooks, under appointment by the Court of Appeals, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Julia Y. Je, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**DONDERO, J.**—Defendant Chad Andrew Larsen was convicted following a jury trial of conspiracy to commit murder and solicitation to commit murder. The trial court sentenced him to 25 years to life for the conspiracy conviction, and a concurrent nine-year term for the solicitation conviction. He contends the trial court infringed on his constitutional right to present a defense by failing to give an instruction on mental disorder and intent, failed to give instructions on entrapment and the criminal liability of his coconspirator, and erred by denying his motion to recuse the entire prosecutor's office prior to sentencing.

We conclude that the trial court committed error by refusing to give the CALCRIM No. 3428 instruction on evidence of mental disorder and intent. The instructional error was, however, not prejudicial. We find that no other errors were committed. We therefore affirm the judgment.

### STATEMENT OF FACTS

In January of 2008, defendant was arrested and subsequently charged with felony violations of unlawful sexual intercourse and oral copulation with a minor (Pen. Code, §§ 261.5, subd. (c), 288a, subd. (b)(1)),[1] 16-year-old Jane Doe. While defendant was held in the Humboldt County jail awaiting trial, his father, Dennis Larsen (Dennis), regularly visited him. To avoid the recording devices on jailhouse phones, defendant would often communicate with Dennis by holding up handwritten notes to the glass partition in the visiting room.

During the first visit defendant told Dennis he "wasn't guilty of what he was charged with," and did not want the case "to go forward." Defendant expressed apprehension to Dennis that should Jane Doe testify against him,

---

[1] Subsequent statutory citations are to the Penal Code unless otherwise indicated.

he would be convicted.[2] He hoped she would not testify because he feared going to prison and being required to register as a sex offender.

Dennis soon realized that defendant "had had sex with a minor." Defendant "was very concerned about scientific evidence" that might "support the charge against him of . . . statutory rape." He repeatedly asked Dennis to "wipe down the front seat" of his truck by rubbing a "tri-tip roast" into the seat to eliminate "DNA evidence" linking him to Jane Doe. Dennis complied, using a towel soaked in tri-tip or other meat juice.

Evidence was presented that defendant contacted several fellow jail inmates with proposals to kill Jane Doe to prevent her from testifying at trial. Between February and June 2008, at defendant's request Dennis sent two $500 money orders to two Humboldt County jail inmates at different post office boxes, each addressed to "our friend."

Defendant also approached fellow Humboldt County jail inmate Scott Schwartz with a scheme for him to go to the victim's residence, kick the door in, "pretend [to be] police and kill everybody in the house so she couldn't testify." In May of 2008, defendant enlisted Dennis to pay Schwartz, who by then had been released from jail, $1,500, and give him a ride to San Francisco, in exchange for carrying out the murder of Jane Doe.[3] Dennis gave Schwartz the money and drove him to San Francisco, but Schwartz failed to perform the murder, and subsequently tried to blackmail Dennis and defendant.

On several occasions defendant offered another inmate he met in the "same tier" of the county jail, William Lenard, money to kill Jane Doe to prevent her from testifying. Defendant referred to the victim as a "little drug addict whore that didn't deserve to live," and feared that he "would be sent to prison for a long time" if convicted. Over the course of two weeks, defendant first offered Lenard $1,500, then raised the price to $2,000, to "make sure his witness couldn't testify." Lenard finally told defendant, "I don't want to hear it no more."

Lenard testified that he overheard defendant talk to "other people" in the common area of the facility, one of them Schwartz, "about having the victim killed" and burying her on property he owned. Defendant often discussed "different ways" they could kill the victim and "get away with it," and mentioned that if the victim "can't show up," they "don't have a case." When

---

[2] Defendant had been previously convicted of unlawful sex with a minor in 2006, and was on probation at the time of the 2008 sex offenses.

[3] Dennis later claimed the money was for a motorcycle defendant was buying from Schwartz, but the sale never took place.

he was released from custody in May 2008, Lenard reported defendant's murder proposals to his probation officer and a district attorney investigator.

Brian Ekker was defendant's cellmate in Humboldt County jail. Defendant told Ekker that he was "worried about" Jane Doe's testimony. Defendant wanted to pay someone "on the outside" to "get rid of her" so she "would not testify." He offered Ekker $1,000 and a "broken down three wheeler" to kill Jane Doe. Defendant suggested Ekker drive by Jane Doe and shoot her. Ekker refused the offer. Ekker testified that defendant told him he had asked other inmates, including Schwartz, to murder Jane Doe, but they "took the money" and failed to do the job.

In late April or early May 2008, defendant met inmate Carlton Wallace in the jail. Defendant told Wallace he feared being convicted, and had offered Jane Doe money not to testify, to no avail. Defendant asked Wallace to murder Jane Doe for money. Defendant offered Wallace $5,000, saying Dennis would give him the money. Defendant told Wallace if he murdered Jane Doe he also could be defendant's partner in a marijuana growing operation he was planning on his father's farm. Wallace believed defendant's proposal was serious.

Defendant suggested that Wallace befriend Jane Doe, who defendant claimed was a drug addict, and give her a bag of "bad drugs" to kill her. According to defendant's plan, Wallace would then take her body to Dennis's farm on Port Kenyon Road in Ferndale. Wallace would place the body in a trough tied down with straps, pour concrete over the body, and deposit it under a concrete slab on the property. Defendant drew detailed maps showing where Jane Doe lived and gave them to Wallace. He also gave Wallace a detailed description of Jane Doe and wrote out detailed, step-by-step instructions for Wallace to carry out the murder plan. Defendant provided blueprints of the ranch showing Wallace the location of the materials defendant wanted him to use to conceal the body. Wallace, who was due to be released soon, was to contact Dennis and tell him, "I was the guy that would carry out the . . . plan." Defendant also directed Wallace to tell Dennis to visit him in jail immediately.

In what Wallace described as "the final plan," he was to meet with Dennis to receive $200 and a "bag of bad drugs" to be given to Jane Doe. Once he received the drugs, Wallace was supposed to convince Jane Doe to call her mother and say she was going to San Francisco for a week or two with some friends and "didn't want to be bothered," and post a similar message on her "My Space page." Wallace was then to remove the battery from Jane Doe's cell phone, and tell her to accompany him, to San Francisco to bring "back some drugs to Humboldt," in exchange for drugs and cash she would receive.

Wallace was to give Jane Doe tainted drugs "that was supposed to kill her." If that "didn't kill her," Wallace was directed to snap her neck with "four pounds of pressure" necessary to "break someone's neck."

After Jane Doe was dead, the plan called for Wallace to take the body to the Ferndale farm where he would find shovels to dig a hole, a trough, some tiedown straps, and some fast-drying concrete. Defendant said he would arrange through Dennis to have the shovels and other materials there. Wallace was to strap Jane Doe's body into a fetal position with the tiedown straps to make her more compact to fit into the trough, fill the trough with concrete, and bury it under a concrete slab, covering the hole with debris. Defendant told Wallace he would wait a year or two after he was released, dig up the body, put it in his boat, and dump it in the ocean. Defendant professed to Wallace that "he'd be safe," and they would both "be rich" marijuana growers.

Defendant drafted a "blueprint of everything" for Wallace, including a drawing of the trough and a note stating exactly what Wallace was to say to Dennis. The note read as follows: "I know who your son knows and have spent two months with him. I'm the friend he mentioned. . . . To further your son's, yours, and my own goals, I am going to need seed money and for your—and for you to gather enough QUIKRETE to have fill that gray trough so that I may build a support and the cement ramp and fill the hole. I have legitimate need myself to do this, and I will do it. I have no wire, no blackmail, and certainly no mistakes. This is the only and last time this will be talked about. And Chad is the one who will pay me when I'm out. Chad's case will be dismissed when his witness runs away to Mendocino." Defendant also provided Wallace with a picture of his dog "Wuffle" to give to Dennis, "a picture that he knew his son wouldn't part with."

Wallace believed he was being set up to take the blame for the murder. He revealed defendant's plan to his attorney, Glenn Brown, and told Brown he did not want to be involved. Brown reported the matter to the district attorney's office, which sent Chief Investigator Hislop and two other investigators to interview Wallace. Wallace provided the investigators with some or all of the writings he received from defendant, presumably the detailed instructions and maps, plus a picture of a dog.

The investigators fitted Wallace with a recording device. Wallace recorded a conversation in which defendant again detailed the murder plot. In the recorded conversation, defendant tells Wallace: "[W]hat I was thinking is you go into my dad's garage . . . . You grab three tie-down straps . . . . And the three tie-down straps, you put 'em, you put her feet in . . . fetal position. You tie one around one knee, one around her shin, and you crank down." Wallace

asks, "While she alive?" Defendant replies, "Fuck no. When she's dead. You crank down, crank down, crank down. Get her as small as possible, right?" He continues by saying that once Jane Doe was "compact" Wallace would put her in the "tub"—presumably the trough—in the bottom of the hole ("put her one thirty pound ass in"), then fill it with concrete. Wallace asked what he should do if there was no concrete at the farm. Defendant replied, "I'll . . . just have dad go get it."

On June 12, 2008, Wallace was released from the Humboldt County Jail, but was transferred to the Del Norte facility so defendant would think Wallace had been released from custody. At 11:00 that morning, Wallace called Dennis as defendant had directed and identified himself as Carl, someone who knew defendant. Wallace told Dennis to visit defendant in the jail immediately.

Dennis and Roy Potvin, a longtime family friend, visited defendant at the jail on June 12. Defendant held up a piece of paper for Dennis with Wallace's name and phone number and told Dennis he must give Wallace $500 immediately. Dennis testified this note read, "You must pay this man $500 and here's a phone number. You must call this. Don't forget." Apparently, the note stated in large bold letters, "Last Time."

Despite Dennis's testimony on the content of the note defendant displayed to him during the visit on June 12, the record is less than clear on the exact text of the note. Wallace testified regarding two other notes which defendant may have held up during a visit with Dennis. One note read: "To show he's legit, Carl will dig under the ramp behind the barn to put in the new foundation. Cash in McKinleyville. Buy five bags of Quickrete. Hand Carl shovels, the gray three-layered trough, five-gallon buckets, a heavy chain, and three heavy duty, tie-down straps. . . ." Another note read: "This is the final time. I go to court on Friday, 13th. I need my problem fixed. He knows my problems, friends. Talk to him. Give him $500 from my bank account so he can buy supplies to build a cement support under the ramp."[4]

On the afternoon of June 12th, Dennis went to the credit union, as defendant asked, to withdraw $1,000—$500 to pay some bills and $500 for "Carl."[5] Later that day, Dennis received a second call purportedly from Carl, who this time was Probation Officer Greg Allen posing as Carlton Wallace. "Carl" told Dennis he needed shovels and $500. Dennis suspected there was going to be "a hit," and someone may be killed. He expressed concern to friends that defendant was trying to have Jane Doe killed.

---

[4] Defendant's reference to a Friday the 13th court date is revealing. We take judicial notice that the day of the visit, June 12, 2008, was a Thursday.

[5] Dennis testified he thought the $500 was money defendant owed Carl, or possibly for protection in jail or to help finance defendant's planned marijuana farm.

Nevertheless, Dennis participated in the scheme described to him by the man he thought was defendant's friend Wallace. Dennis and Potvin went to a hardware store where Dennis bought two shovels, some tape, and some permanent markers. They then went to Dennis's ranch in Ferndale, and left the two shovels and $500 in an envelope next to the mailbox for Wallace. Dennis put a note in the envelope telling Wallace he would receive no more money. Dennis received a call from "Carl," and told "Carl" the items were waiting for him.

Dennis received several more calls from "Carl" which were recorded by investigators. "Carl" spoke in detail about the murder plot. Dennis became uneasy and upset when "Carl" requested help to bury a body behind the barn, and told "Carl" that "the deal is off." Dennis realized that "this person" intended to enlist his assistance in the commission of a murder, and went to the Ferndale property to attempt to retrieve the shovels and money—which were gone, having been removed by investigators.[6]

For "damage control" and to "cover his ass," Dennis reported the possible murder plot against Jane Doe to the Ferndale police at 5:00 that afternoon, and gave a voluntary statement to Investigator Hislop and another officer. Dennis was later arrested, and ultimately entered a plea of no contest to solicitation to commit murder (§ 653f, subd. (b)) and being an accessory to a crime (§ 32). Hislop subsequently interviewed Schwartz, who told him Dennis was part of the conspiracy to murder Jane Doe.

Defendant testified on his own behalf. He admitted a prior conviction for "consensual 'sexual intercourse with a minor' " (§ 261.5, subd. (c)), and his 2009 convictions for sex offenses with Jane Doe.[7] He did not contact Jane Doe after January of 2008.

Defendant denied that he paid Jane Doe any money, or ever personally or through Dennis contacted her parents or boyfriend to seek to prevent her from testifying against him. He never threatened her or her family. He never asked anyone to kill Jane Doe so she would not testify. The $500 payments that Dennis described making to various jail inmates had nothing to do with Jane Doe, but were payments for protection from physical assault inside the jail.

---

[6] According to Hislop's testimony, this "final plan" for the hit—the placing of the shovels and money, presumably—was not something that originated from Wallace, but from "Carl" at Hislop's direction. But the "final plan" was certainly consistent with the plans emanating from defendant.

[7] We affirmed the convictions. (*People v. Larsen* (Dec. 8, 2010, A126424) [nonpub. opn.].)

Defendant had problems growing up, including learning disabilities, and was not liked by his teachers or his classmates. As his problems continued in high school, his teachers recommended counseling. His counselors referred him to psychologists.

Rather than socializing with others, defendant kept to himself and played video games or computer role-playing games, like Dungeons and Dragons and Pools of Radiance, that were derived from comic books. The comic books were all based "on female heroines combating crime, defeating the bad guys using friendship and teamwork."

During high school, defendant spent more time participating in role-playing games, and made some friends "who liked to role play" on a serious level. Defendant testified that in role-playing there is always a "game master" who defines the mission and the scenarios and takes command of the game.[8]

While in county jail, defendant made two payments of $500 through Dennis to a fellow inmate, Fred Schallenberg, for protection. Defendant also approached Schwartz for protection from "an inmate named Josh Cooly" who repeatedly threatened to stab him. In exchange, defendant gave Schwartz food from his tray and "bought him commissary." He also socialized with Schwartz; they read defendant's comic books. Defendant testified that the $1,500 he paid to Schwartz was for a motorcycle and a ride to the Delancey Street program, not to kill Jane Doe.

Defendant met Wallace in jail through Schwartz. Defendant and Wallace exchanged information on their cases and people they knew in common, including Jane Doe and her friends Lindsay and Sarah. Wallace told defendant he was their "drug dealer."

Defendant grew to trust Wallace, and they discussed a future marijuana cultivation operation on defendant's property in Ferndale to be run by Wallace when they were released. The $500 defendant asked Dennis to give Wallace was for a soil analysis of the planned marijuana farm.

Defendant and Wallace began to engage in discussions about "role-playing" related to their cases and "things that [they] knew in real life," such as "keeping a witness from testifying." He and Wallace engaged in "lots" of role-playing games. Wallace was the acknowledged "game master," who orchestrated the role-playing by giving defendant verbal or body language

---

[8] Defense witnesses testified the game master controls the game, selects the scenarios, selects the characters, and chooses what world the game occurs in. Scenarios can come from role-playing books, comic books, or movies.

cues.[9] Wallace threatened that he would not participate in the marijuana cultivation venture unless defendant followed his role-playing signals.

Their discussions about Jane Doe were not related to an actual conspiracy to kill her, but rather merely part of their role-playing games in which defendant and Wallace invented various scenarios based on comic book stories and role-playing books defendant had in jail. Defendant explained: "The quotes, the scenarios, some of the characters' names such as Deacon, Sarah, Dennis, et cetera, which were also in the comic books and matched people we knew in real life."

As part of their role-playing game, the victim was to be buried in a gray water trough. Wallace used the trough because it was something from Dennis's ranch with which defendant was familiar. One of the bases for their role-playing game was the heroine in the comic book Empowered, who is tied and chained up and compacted in a trough or oval hole, but is saved by her fellow heroes and does not actually get killed.[10] Defendant testified, "No heroine . . . ever gets killed in any of my comic books that I know of."

Catherine Silver, a psychiatric physician's assistant for Dr. Irving Tessler, testified as a defense expert on Asperger's syndrome and autism. In her capacity as assistant to Dr. Tessler, Silver diagnosed and treated patients with autism, Asperger's syndrome, and other psychiatric disorders. Asperger's is a "high-functioning variant of Autism," which manifests itself primarily in social dysfunction. A child with Asperger's will have difficulty making friends. He will talk obsessively about topics that interest him without "picking up on social cues." He will lack social or mental filters, and thus say whatever he is thinking without regard to whether it is appropriate.

Defendant was diagnosed with Asperger's syndrome around 1997, and became a patient of Dr. Tessler in the early 1990's. Silver reviewed defendant's records, examined him, and personally diagnosed him with Asperger's syndrome.

Silver testified that role-playing is a "huge obsession" with defendant that occupies "hours and hours of time." It provides him with a social outlet, a place where he can be accepted by others who are themselves obsessed or

---

[9] Supposedly, Wallace had the words "game over" tattooed on his arms. If he folded his arms to reveal "game," the game was on; to reveal "over," the game was off. As defendant put it, "[A]s we were talking, I would slip back and forth between real and fake depending on how he would hold his arms."

[10] Typically, some role-players are villains and some are heroes. In the game World of Darkness, each player was to "start as a regular person" and then "work to becom[e] a hero and stop[] a great evil."

otherwise disabled. According to Silver, role-playing occupies so much of defendant's time that "he doesn't live in the real world. He lives in a[n] intellectual fantasy world much of the time."

Silver also testified that defendant is socially naïve and is susceptible to manipulation by others. He can be influenced to say things against his own interests that are consistent with his fantasies. Because defendant has no social filter and always speaks what is on his mind, a clever person can manipulate him to act contrary to his own interests. He also has a "desire at any cost" to please others and give them "something to get them to be his friends." He is thus easily manipulated. He is prone to approach others to "have his own needs met."

Silver also testified that as an Asperger's patient defendant had impaired empathy for others and was inclined to manipulate others to meet his needs. He tends to have narrow interests and engage in obsessive thinking.

Two inmates who became acquainted with defendant in Humboldt County jail recounted statements made to them by Wallace to the effect that "in exchange for a deal" to drop his charges, he had "given the DA everything" they needed for a case against defendant. According to the defense witnesses, Wallace manipulated defendant through an "RPG," role-playing game, to get him to "say anything he wanted him to say." The manipulation was accomplished through timed signals that "involved tattoos and hand signs," and conveyed a message to defendant that prompted him to respond "on a wire" in the manner Wallace wanted.

## DISCUSSION

### I. *The Trial Court's Failure to Give an Instruction on Mental Disorder.*

Defendant contends the trial court infringed on his constitutional right to present a defense based on his purported mental impairment caused by Asperger's syndrome, and how it affected his perceptions and mental processes. He claims the evidence of his mental disorder supported his defense that the detailed plans for Jane Doe's murder were part of an elaborate fantasy within the confines of a role-playing game. He thus claims he lacked the intent to kill. He argues the trial court infringed upon his right to present a mental impairment defense by refusing to give an instruction in the terms of CALCRIM No. 3428, which reads in pertinent part: "You have heard evidence that the defendant may have suffered from a mental (disease[,] / [or] defect[,] / [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.

[¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state [required for the charged crimes]. If the People have not met this burden, you must find the defendant not guilty of [the charged crimes]."

The trial court refused defendant's request to give this instruction, ruling that "[t]here just simply isn't any evidence that [defendant] didn't have the mental capacity to form the mental—the specific intent or didn't form that." Defendant maintains "the record did indeed contain evidence that he lacked the intent to kill and that his Asperger's Syndrome was relevant to that claim, and the court's refusal to instruct the jury with CALCRIM [No.] 3428 severely hampered the presentation of his defense," in contravention of his due process rights.

## A. *The Evidence to Support the CALCRIM No. 3428 Instruction.*

█ Our inquiry into the trial court's obligation to give the requested CALCRIM No. 3428 instruction proceeds from the fundamental principle that a "defendant, upon proper request therefor, has a right to an instruction to direct the jury's attention to evidence from which a reasonable doubt of his guilt could be inferred." (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 924–925 [49 Cal.Rptr.2d 86].) "The trial court has an 'obligation to instruct on defenses, . . . and on the relationship of these defenses to the elements of the charged offense . . .' where '[¶] . . . it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense . . . .' [Citations.]" (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1848 [52 Cal.Rptr.2d 765].) But, the court must "give a requested instruction concerning a defense only if there is substantial evidence to support the defense." (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1116 [117 Cal.Rptr.2d 715]; see *People v. Pollock* (2004) 32 Cal.4th 1153, 1176 [13 Cal.Rptr.3d 34, 89 P.3d 353].) "[A] trial judge must only give those instructions which are supported by substantial evidence," and "has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence." (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 [52 Cal.Rptr.2d 422]; see *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1355 [37 Cal.Rptr.2d 304].) "[T]he court is not obliged to instruct on theories that have no evidentiary support." (*People v. Joiner* (2000) 84 Cal.App.4th 946, 972 [101 Cal.Rptr.2d 270]; see *People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Substantial evidence in this context " 'is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " ' [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 331 [30 Cal.Rptr.3d 513, 114 P.3d 758].) "In determining whether the evidence is

sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . .' [Citations.]" (*People v. Salas* (2006) 37 Cal.4th 967, 982–983 [38 Cal.Rptr.3d 624, 127 P.3d 40].) " ' " 'The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.' " ' [Citation.] As an obvious corollary, if the evidence is minimal and insubstantial the court need not instruct on its effects." (*People v. Springfield* (1993) 13 Cal.App.4th 1674, 1680 [17 Cal.Rptr.2d 278].)

" ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." [Citations.]' [Citation.] Even so, the test is not whether *any* evidence is presented, no matter how weak. Instead, the jury must be instructed when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded" ' that the specific facts supporting the instruction existed. [Citation.]" (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677 [7 Cal.Rptr.3d 726].) "We review this issue as one of law." (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1017 [75 Cal.Rptr.2d 626].)

■  The question, as it is "properly phrased" in CALCRIM No. 3428, "is 'whether the defendant actually formed the required specific intent.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 832 [130 Cal.Rptr.3d 191, 259 P.3d 370].) CALCRIM No. 3428 is a pinpoint instruction that must be given only if requested by the defendant, and only if substantial evidence supports the defense theory that defendant's mental disease or disorder affected the formation of the relevant intent or mental state. (*People v. Ervin* (2000) 22 Cal.4th 48, 91 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Also, expert medical opinion testimony is necessary to establish that a defendant suffered from a mental disease, mental defect, or mental disorder within the meaning of CALCRIM No. 3428, because jurors cannot make such a determination from common experience. (*People v. Moore, supra,* 96 Cal.App.4th 1105, 1116–1117; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1229–1230, 1247–1249 [74 Cal.Rptr.2d 212, 954 P.2d 475]; *People v. Cox* (1990) 221 Cal.App.3d 980, 987 [270 Cal.Rptr. 730].)

In the present case, Catherine Silver, a psychiatric physician's assistant, testified as an expert on the diagnosis and treatment of Asperger's syndrome. She was versed in psychiatric disorders, and had personal experience with both the diagnosis and treatment of defendant as an Asperger's patient. Although the defense did not provide a foundation for a ruling that Silver was qualified as an expert, she testified in that capacity without objection from the prosecution.

We further conclude that Asperger's syndrome is a recognized mental diagnosis that warrants a mental disorder instruction, at least in the context of the conspiracy and solicitation to commit murder charges faced by defendant presented here.[11] Both conspiracy and solicitation require proof of the element that the defendant had the specific intent to commit or effectuate commission of the alleged underlying offense, in this case murder. (See *People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 11 [58 Cal.Rptr.3d 421, 157 P.3d 1017]; *People v. Jurado* (2006) 38 Cal.4th 72, 120 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Herman* (2002) 97 Cal.App.4th 1369, 1381–1382 [119 Cal.Rptr.2d 199]; *People v. Hall* (2000) 83 Cal.App.4th 1084, 1094 [100 Cal.Rptr.2d 279].) Solicitation as alleged may be complete when conversations occur, irrespective of any overt act committed by the defendant to achieve the murder, or whether the object of the solicitation is ever actually undertaken or accomplished. (*People v. Superior Court, supra*, at p. 11; *People v. Wilson, supra*, 36 Cal.4th 309, 328; *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377–1378 [112 Cal.Rptr.2d 620]; *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1708–1709 [54 Cal.Rptr.2d 608].) Conspiracy, unlike solicitation, requires an agreement with another to commit or join in a feature of the alleged criminal object, along with an overt act in furtherance of the illegal objective. (*People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8 [134 Cal.Rptr. 784, 557 P.2d 75]; *People v. Tatman* (1993) 20 Cal.App.4th 1, 10–11 [24 Cal.Rptr.2d 480].) Yet the focus is on the agreement with at least one other person to participate in an offense and no additional steps need be taken by the defendant towards its completion. (*People v. Fenenbock, supra*, at p. 1709.) It is immaterial that the object of either the solicitation or the conspiracy is never achieved. (*People v. Saephanh* (2000) 80 Cal.App.4th 451, 460–461 [94 Cal.Rptr.2d 910].) The intent with which statements are made, plans are discussed, and agreements are confirmed, therefore becomes crucially important to prove solicitation or conspiracy accusations where no subsequent acts are undertaken by the defendant.

Defendant's request for the mental disorder instruction was appropriate in light of the evidence presented in the case to support the solicitation and conspiracy charges. The primary testimony offered against defendant was derived from conversations he had with other inmates in the closed, coercive

---

[11] "Asperger's Disorder is [defined as] an autism spectrum disorder characterized by a 'severe and sustained impairment in social interaction . . . and the development of restricted, repetitive patterns of behavior, interests, and activities.' American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders 75* (4th ed. 1994) (DSM-IV); *see also* National Institute of Neurological Disorders and Stroke, Asperger Syndrome Fact Sheet, *http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm* [hereinafter NINDS, *Fact Sheet*]. Persons with Asperger's Disorder often exhibit 'socially and emotionally inappropriate behavior' and an 'inability to interact successfully with peers.' NINDS, *Fact Sheet, supra.* They have difficulty communicating with others and may not understand normal body language and gestures." (*State v. Burr* (2008) 195 N.J. 119, 123, fn. 2 [948 A.2d 627].)

structure of incarceration. The essential issue presented by the defense evidence, and brought into focus by Silver's testimony, was defendant's mental state—specifically, whether he intended by his statements to effectuate the killing of Jane Doe, or instead was merely engaging in role-playing and seeking to curry favor with other inmates.

■ Of course, Silver did not, and could not, offer an opinion that defendant's mental condition precluded him from entertaining the requisite intent for the charged offenses. Sections 28 and 29 prohibit "an expert from offering an opinion on the ultimate question of whether the defendant had or did not have a particular mental state at the time he acted." (*People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 [58 Cal.Rptr.2d 294].) "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*People v. Coddington* (2000) 23 Cal.4th 529, 582 [97 Cal.Rptr.2d 528, 2 P.3d 1081], fns. omitted, overruled on unrelated grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]; see *People v. Cortes* (2011) 192 Cal.App.4th 873, 902 [121 Cal.Rptr.3d 605].)

■ Nevertheless, Silver offered expert medical testimony that defendant was suffering from a mental disorder at the time of the commission of the crime, thereby providing an evidentiary basis for the CALCRIM No. 3428 instruction. She not only testified definitively that defendant had been diagnosed with Asperger's syndrome, but also described defendant's disorder to include features pertinent to the effort of the defense to negate the intent element of the solicitation and conspiracy offenses: his lack of social or mental filters, inclination to make inappropriate comments, inordinate desire to please others, susceptibility to manipulation, obsessive thinking, and compulsive fascination with fantasy role-playing to the exclusion of reality. Silver specifically testified that defendant is socially naïve and subject to manipulation by others to say things adverse to his own interests. Silver's opinion testimony on the effects of defendant's Asperger's syndrome was both probative and admissible on the issue of whether defendant actually formed and expressed the requisite intent to procure Jane Doe's murder. (See *State v. Burr, supra,* 948 A.2d 627, 629; *State v. Boyd* (Mo.Ct.App. 2004) 143 S.W.3d 36, 45–46.)

Defendant's testimony did not touch upon his mental condition, but somewhat substantiated the claim of lack of intent. He testified that he was a

social misfit who gravitated to an impulsive obsession with fantasy role-playing to escape reality. He denied that he intended to have Jane Doe killed, and asserted that his conversations with Wallace were all part of a role-playing fantasy game orchestrated by Wallace. Even if the defense evidence of mental disorder and absence of intent may be classified as less than highly persuasive and was disputed by conflicting evidence—of, for instance, the detailed notes and plans drawn for Wallace, and incriminating conversations with other inmates that did not seem to implicate defendant's Asperger's syndrome—the court does not measure the substantiality of the evidence by weighing conflicting evidence or the credibility of the witnesses. (*People v. Mentch* (2008) 45 Cal.4th 274, 288 [85 Cal.Rptr.3d 480, 195 P.3d 1061]; *People v. Salas, supra,* 37 Cal.4th 967, 982–983; *People v. Zamani* (2010) 183 Cal.App.4th 854, 885 [107 Cal.Rptr.3d 608].) "In deciding whether defendant was entitled to the instructions urged, we take the proffered evidence as true, 'regardless of whether it was of a character to inspire belief. [Citations.]' [Citation.]" (*People v. Petznick, supra,* 114 Cal.App.4th 663, 677.)

We point out that to justify the CALCRIM No. 3428 instruction the defense was not required to either offer the theory or present additional evidence that defendant's Asperger's syndrome impaired his *ability* to form the requisite criminal intent to commit the crime of solicitation to commit murder or conspiracy to do the same. The CALCRIM No. 3428 instruction, and sections 28 and 29, do not focus on whether a defendant had the *mental capacity* to form a specific intent, a prohibited inquiry in any event, but rather on " 'whether a defendant actually formed a mental state that is an element of a charged offense.' " (*People v. Vieira* (2005) 35 Cal.4th 264, 292 [25 Cal.Rptr.3d 337, 106 P.3d 990], quoting *People v. Coddington, supra,* 23 Cal.4th 529, 582.) It is the actual formation of intent in light of the defendant's mental disorder, not the capability to do so, that is the fundamental inquiry posited by CALCRIM No. 3428. (*People v. Blacksher, supra,* 52 Cal.4th 769, 832.) Thus, the trial court's announced finding, "There just simply isn't any evidence that [defendant] didn't have the *mental capacity*" to form the specific intent for the conspiracy and solicitation offenses, was off the mark. (Italics added.) The evidence that defendant suffered from Asperger's syndrome, and its manifested symptoms, directly and materially reflected on his claim that he did not actually intend to solicit the victim's murder, but instead was engaged in some form of game playing brought on by his mental disorder.

The concurring opinion argues there is a paucity of evidence defendant's diagnosed Asperger's syndrome precluded him from having specific intent. We believe the evidentiary hurdle presented in the concurrence intrudes on the jury's function. CALCRIM No. 3428 presents two fundamental points: First, the jury is told "it has heard evidence the defendant may have suffered from a mental (disease[,] [or] defect[,] [or] disorder.)" Second, the jury is

advised it "may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for the crime."

■ Consequently, if there is evidence from a qualified expert the defendant suffered from a mental disease, defect or disorder at the time of the crime—as Silver testified here (i.e., that defendant was treated since the seventh grade and suffered then and now from an autism spectrum disorder)—the particular mental disease, defect or disorder becomes a matter for the jury to consider as that fact finder believes appropriate in deciding whether the defendant acted with the required mental state. Neither the language of CALCRIM No. 3428 nor any case mandates, as the concurring opinion seems to argue, there must be expert evidence showing the defendant suffers from a mental disorder like Asperger's *and* that the identified mental disease, defect, or disorder "generally impairs criminal intent," or does so in a "hypothetical situation" like the one present in the case. Indeed, it may be the case that evidence of the latter sort—the "hypothetical situation"—would come dangerously close to the territory *precluded* by sections 28 and 29.[12]

We conclude that the expert testimony of defendant's mental disorder of Asperger's syndrome, in conjunction with the remaining evidence, was at least substantial on the issue of his actual formation of the specific mental state that is an element of the charged solicitation and conspiracy offenses. Therefore, the trial court erred by failing to give the CALCRIM No. 3428 mental disorder instruction. (*People v. Musselwhite, supra,* 17 Cal.4th 1216, 1229–1230, 1247–1249; *People v. Cox, supra,* 221 Cal.App.3d 980, 987–988; *People v. Aguilar* (1990) 218 Cal.App.3d 1556, 1569 [267 Cal.Rptr. 879], disapproved on other grounds in *People v. Ervin, supra,* 22 Cal.4th 48, 90–91; *People v. Molina* (1988) 202 Cal.App.3d 1168, 1171 [249 Cal.Rptr. 273]; *People v. Young* (1987) 189 Cal.App.3d 891, 907–909 [234 Cal.Rptr. 819].)

---

[12] The concurring opinion discusses *People v. Panah* (2005) 35 Cal.4th 395 [25 Cal.Rptr.3d 672, 107 P.3d 790], where the Supreme Court decided the defendant was not entitled to CALJIC No. 3.32, an equivalent to CALCRIM No. 3428, because there was no testimony from a medical expert the defendant was actually suffering from a mental condition at the time of the crime. In that case, an emergency room physician who treated the defendant more than 24 hours after the victim's disappearance, noted the accused was psychotic and delusional. (*Panah, supra,* at pp. 484–485.) The court noted there was no evidence of impairment when the defendant assisted others in attempting to locate the missing victim before the ER visit. This was "[a]t best" evidence the defendant might suffer from some "long-standing latent psychosis," but there was no evidence, let alone by a medical expert, the defendant was actually suffering from any mental problem at the time of the offense. (*Ibid.*) Here, there was expert medical testimony that defendant, at the time of the crimes, was suffering from an ongoing and manifest mental disorder—Asperger's syndrome.

B.  *The Standard of Prejudicial Error.*

We turn our inquiry to the prejudicial effect of the error. Our first task is to determine the applicable test of prejudicial error. Defendant asserts that the court's failure to give the mental disorder instruction "infringed his Fourteenth Amendment due process right to present a defense" by preventing a "fair jury evaluation" of his mental impairment claim, and thus the governing test of prejudicial error is whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).)

Existing case law fails to support defendant's position. The California Supreme Court has directly declared, although without thorough discussion, that the error must be evaluated under the much less stringent standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*). (*People v. Ervin, supra,* 22 Cal.4th 48, 91; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 663 [21 Cal.Rptr.3d 612, 101 P.3d 509]; *People v. Coddington, supra,* 23 Cal.4th. 529, 583–584; *People v. Cortes, supra,* 192 Cal.App.4th 873, 912.)

Upon analysis we agree that the *Watson* standard of review is appropriate to evaluate the instructional error at issue here. "Any 'misdirection of the jury' (Cal. Const., art. VI, § 13), that is instructional error [citation], cannot be the basis of reversing a conviction unless ' "an examination of the *entire cause, including the evidence,*" ' indicates that the error resulted in a ' "miscarriage of justice." ' [Citation.]" (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 858 [128 Cal.Rptr.3d 565].) A distinction is drawn "between instructional error that entirely precludes jury consideration of an element of an offense and that which affects only an aspect of an element." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1315 [18 Cal.Rptr.2d 796, 850 P.2d 1].) An instructional error that relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense, violates the defendant's rights under both the United States and California Constitutions, and is subject to *Chapman* review. (*Neder v. United States* (1999) 527 U.S. 1, 4 [144 L.Ed.2d 35, 119 S.Ct. 1827]; *People v. Mil* (2012) 53 Cal.4th 400, 409 [135 Cal.Rptr.3d 339, 266 P.3d 1030]; *People v. Chun* (2009) 45 Cal.4th 1172, 1201 [91 Cal.Rptr.3d 106, 203 P.3d 425]; *People v. Cox* (2000) 23 Cal.4th 665, 676–677 [97 Cal.Rptr.2d 647, 2 P.3d 1189]; *People v. Flood* (1998) 18 Cal.4th 470, 479–480, 502–503 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *People v. Jensen* (2003) 114 Cal.App.4th 224, 241 [7 Cal.Rptr.3d 609].) "If conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process and invoke the *Chapman* 'beyond a reasonable doubt'

standard for assessing prejudice." (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1128 [38 Cal.Rptr.2d 335].) In contrast, "misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson*. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1244 [67 Cal.Rptr.3d 904]; *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1157 [35 Cal.Rptr.3d 373].)[13]

Here, the court's omission of the CALCRIM No. 3428 instruction did not remove from the jury's consideration or incorrectly define the intent element of the offenses. The jury received the necessary instructions that correctly stated the specific intent element of the solicitation and conspiracy offenses— an intent to kill the victim—and was advised to consider and evaluate expert opinion testimony. The intent to prove murder was also defined for the jury. Moreover, defendant was not denied the opportunity to present expert testimony and argument on the effect of his Asperger's syndrome on the intent element of the offenses. The defense did not challenge any other instructions at trial.

Nothing in the missing CALCRIM No. 3428 instruction resulted in a misstatement of the intent element of the offenses. CALCRIM No. 3428 does not delineate or describe an element of an offense. Rather, it is a pinpoint instruction relating particular facts to a legal issue in the case. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119 [2 Cal.Rptr.2d 364, 820 P.2d 588].) As such it does not involve a " 'general principle of law' " as that term is used in cases that impose a sua sponte duty of instruction on the trial court. (*Id.* at p. 1120; see *People v. San Nicolas, supra*, 34 Cal.4th 614, 669–670; and see *People v. Jennings* (2010) 50 Cal.4th 616, 674–675 [114 Cal.Rptr.3d 133, 237 P.3d 474].) Instead, it draws the jury's attention to specific evidence that highlights the actual effect of a defendant's mental disorder on his relevant mental state. (*People v. Ervin, supra*, 22 Cal.4th 48, 91.) Erroneous failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard. (*People v. Ervin, supra*, at p. 91; *People v. Fudge* (1994) 7 Cal.4th 1075, 1111–1112 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People v. Wharton* (1991)

---

[13] The argument by defendant regarding "structural error," urged here, is inapplicable. "An error is ' "structural," and thus subject to automatic reversal, only in a "very limited class of cases," ' such as the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction. [Citation.] What unites this class of errors is 'a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." . . . Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." ' [Citation.]" (*People v. Mil, supra*, 53 Cal.4th 400, 410.) No such structural error occurred in the present case.

53 Cal.3d 522, 571 [280 Cal.Rptr. 631, 809 P.2d 290]; *People v. King* (2010) 183 Cal.App.4th 1281, 1317 [108 Cal.Rptr.3d 333].)

Reversal of a conviction in consequence of this form of instructional error is warranted only if, " ' "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred [citation].' [Citation.] The question is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed." (*People v. Reeves* (2001) 91 Cal.App.4th 14, 53 [109 Cal.Rptr.2d 728], quoting *People v. Breverman, supra*, 19 Cal.4th 142, 177, 178.) " 'In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1432 [51 Cal.Rptr.3d 263].) We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 35–36 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Eid* (2010) 187 Cal.App.4th 859, 883 [114 Cal.Rptr.3d 520].)

## C. *Evaluation of the Prejudicial Impact of the Instructional Error.*

In our assessment of the prejudicial impact of the error, we start with awareness that defendant's intent was the crucial issue in the case. And, as we have observed, the described symptoms of his mental disorder were imperative to the evaluation of the intent associated with his statements that established the solicitation and conspiracy offenses. The pinpoint instruction went to the heart of the lack of intent defense.

The court's evidentiary rulings and instructions did not, however, suggest that the defense evidence of mental disorder was irrelevant to the issue of intent. The instructions required the jury to find beyond a reasonable doubt, upon consideration of all of the evidence presented, that the specific intent to facilitate commission of the murder was established. The jury was admonished to consider Silver's opinion, determine its "meaning and importance," and evaluate the credibility of her testimony in accordance with the "instructions about the believability of witnesses generally." A specific admonition was given to the jury that defendant's testimony was not to be ignored or disbelieved merely because of his mental impairment. The instructions when viewed as a whole adequately informed the jury that it could consider the evidence of defendant's mental disease or defect in deciding whether the People had carried their burden of proving the mental elements of conspiracy and solicitation beyond a reasonable doubt. (See *People v. Musselwhite, supra*, 17 Cal.4th 1216, 1249.)

The defense was essentially given the opportunity to both present expert opinion testimony on mental disorder and intent, and use the testimony to attempt to negate proof of the intent element of the crimes. During closing argument defense counsel emphasized defendant's lack of restraint, his fixation with imaginary, fantastical plots, and his role-playing with Wallace. The theme in defendant's comic book that mimicked the plan of binding the victim with "three ties" and burying her in an "oval hole" was mentioned by defense counsel to support the role-playing theory. Defense counsel also stressed the court's instruction that defendant's "developmental disability" or "mental impairment" did not weaken his credibility as a witness.

Silver's testimony was emphasized by the defense during closing argument. Defense counsel pointed out that Silver treated and diagnosed defendant with Asperger's syndrome in 2007, before the solicitation and conspiracy occurred, so the mental disorder claim was not concocted disingenuously to "develop a defense." Counsel thoroughly summarized the expert's explanation of Asperger's syndrome symptoms, and asserted that the diagnosis by Silver revealed defendant as a person "susceptible to somebody that could manipulate if they were able to tap into his fantasy, his role-playing." Finally, counsel argued that the flawed, illogical nature of the detailed murder plot as described by Wallace was "consistent" with Silver's description of defendant's unreal behavior and role-playing. Defense counsel's argument reinforced the concept that defendant's mental disorder provided a basis to find that he did not intend the killing of Jane Doe.

While the prosecutor exhibited an inappropriately cavalier and even demeaning attitude by referring to the "Asperger's Syndrome" defense as "insulting," and advised the jury to consider Silver's testimony that defendant was "bright" and "manipulative," neither the prosecutor's argument nor the refusal to give the CALCRIM No. 3428 instruction eviscerated the defense based on mental disorder and lack of intent.[14] Silver's testimony was admitted, and the jury was told to evaluate her expert testimony in the same manner as any other evidence. Unlike other cases in which prejudicial error has been found, defendant was not prevented from offering expert testimony to support the primary defense that his affliction with Asperger's syndrome impaired his ability to formulate the intent to commit the offenses. (Cf. *People v. Cortés, supra*, 192 Cal.App.4th 873, 912–913.) The sole impact of the instructional omission was the lack of a specific directive to the jury to consider the expert testimony for the limited purpose of deciding whether, at the time of the charged crime, defendant acted with the intent or mental state required for the solicitation and conspiracy offenses. To be sure, the omission

---

[14] The prosecutor also told the jury that the instruction on defendant's mental disorder and evaluation of his credibility did not mean "that he shouldn't be held accountable."

of a CALCRIM No. 3428 instruction deprived defendant of singular, distinctive focus on the expert testimony, but it did not leave the jurors with the misconception that they must in any way discount either Silver's testimony or the Asperger's syndrome defense. Nothing in the instructions or argument precluded the jury from at least assessing the mental disorder evidence—and specifically the expert testimony—on the issue of intent.

The evidence that defendant intended to enter into a conspiracy with his father to carry out the murder of Jane Doe is particularly strong. The conspiracy charge as presented by the prosecution was based exclusively on defendant's discussions and plot with his father, not Wallace. Thus, the connection between the symptoms of defendant's Asperger's syndrome and the evidence of intent to commit the charged conspiracy was not at all persuasive, and the evidence of guilt was compelling.

▇▇ The solicitation-to-commit-murder conviction necessitates a slightly different analysis due to the distinct nature of the offense and the associated implications of the error. Evidence of solicitation may be derived entirely from conversations, without evidence of any accompanying agreement or overt act in furtherance of the crime by anyone. "The essence of criminal solicitation is an attempt to *induce another to commit* a criminal offense." (*People v. Herman, supra,* 97 Cal.App.4th 1369, 1381.) For solicitation, the crime is complete when the request is made; the harm is in the asking, and no further acts toward commission of the target crime need occur. (*People v. Morante* (1999) 20 Cal.4th 403, 420 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; *People v. York* (1998) 60 Cal.App.4th 1499, 1503 [71 Cal.Rptr.2d 303]; *People v. Miley* (1984) 158 Cal.App.3d 25, 33 [204 Cal.Rptr. 347].) Thus, proper and focused evaluation of the intent behind defendant's conversations was more essential and probative to the defense of the solicitation charge.

The solicitation charge also focused on Wallace; he was the solicited party. His discussions with defendant formed the basis of the offense, and at the same time were the focal point for the defense evidence of the effect of Asperger's syndrome on defendant's intent underlying his conversations with Wallace. Thus, the CALCRIM No. 3428 instruction was more important to the defense to direct and assure the jury's proper evaluation of the evidence of role-playing and manipulation caused by defendant's Asperger's syndrome as related to the solicitation offense.

Nevertheless, in light of the overall strength of the evidence concerning guilt of both offenses, the nature of the argument presented, and the other instructions given to the jury, a verdict more favorable to defendant would not likely have been reached with a CALCRIM No. 3428 instruction. The evidence of defendant's guilt was not only quite forceful, much of it was

unrelated to manifestations of his Asperger's syndrome. The numerous and detailed discussions, plans, maps, and drawings, the procurement of equipment, the strategy expressed by defendant to strap and compact the intended victim for placement in a cement-filled trough, and the payments made by defendant's father to several inmates, convincingly established that defendant pursued a serious scheme with his father and Wallace to have Jane Doe killed. The tape-recorded conversations do not reveal any exploitation of defendant by Wallace, but rather a meticulous plot concocted by defendant to dispose of Jane Doe. Testimony that defendant expressed a fervent motive and interest in dispatching the sole witness in his pending criminal case came from a host of inmate witnesses in addition to Wallace, most of whom had little or no connection with the role-playing and manipulation that may have characterized defendant's relationship with Wallace or his father. Defendant's strong motive and desire to kill Jane Doe were derived from the circumstances he faced, not his mental disorder. Finally, Silver did not testify that defendant's Asperger's syndrome precluded or even affected his intent to conspire with his father or solicit others to procure the murder of Jane Doe, only that defendant was naïve, easily influenced, obsessive, and subject to prolonged bouts of fantasy in his discussions with others. (*People v. Coddington, supra,* 23 Cal.4th 529, 584.)

We therefore conclude that the trial court's failure to deliver a pinpoint instruction directing the jury's attention to the expert testimony of Asperger's syndrome, while error, does not require reversal of the conspiracy or solicitation convictions. (See *People v. Ervin, supra,* 22 Cal.4th 48, 91; *People v. Fudge, supra,* 7 Cal.4th 1075, 1111–1112.)

II.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The convictions for conspiracy to commit murder and solicitation to commit murder are affirmed.

Banke, J., concurred.

**MARCHIANO, P. J.,** Concurring and Dissenting.—I concur in the majority's affirmance of the judgment. I respectfully disagree with the majority's conclusion that the court erred in refusing to give CALCRIM No. 3428 regarding defendant's mental disorder and specific intent at the time of the commission of the crime.

---

*See footnote, *ante,* page 810.

This case involves 29-year-old defendant Chad Andrew Larsen who was facing charges of plying a 16 year old in January 2008 with oxycodone and cocaine and then forcing her into sexual acts with him. He was awaiting trial when he concocted a plan to kill the victim, Jane Doe, so she could not testify against him.

The majority misperceives the defense theory and theme presented by the record. Defense counsel's opening statement outlined the evidence and the defense from defendant's perspective. Nowhere does defense counsel suggest that Asperger's syndrome would provide a mental defect defense for the charged crimes. He outlined some of defendant's behavioral manifestations and mentioned Catherine Silver, a physician's assistant, diagnosing defendant with Asperger's to explain why defendant was on Social Security and to explain how it affected his social interaction. But there is no hint that the evidence during the trial would show that Asperger's affected defendant's mental status so as to prevent defendant from actually forming the specific intent to commit any of the charged offenses.

Defendant contended throughout the trial that he did not plot or intend to kill the minor victim/witness Jane Doe, but rather his actions and statements were misconstrued by the authorities and the prosecution. A by-product of his Asperger's syndrome was a preoccupation with games with fantastical plots and fantasy comic books. His defense was he was merely game playing, he was not inherently a violent or bad person, and his directions to his father and entreaties to other jail inmates were components of his game playing. The evidence showed defendant instructed and participated in steps to eliminate Jane Doe. Because the trial evidence demonstrated defendant functioned in everyday life with Asperger's, defense counsel recognized he could not rely on Larsen's disorder as an excuse for his actions. His defense strategy was Larsen did not intend to kill Jane Doe or solicit anyone to do so because it was all a game, not that as a result of Asperger's syndrome defendant did not actually form and act with the requisite mental intent when he solicited murder.

As judges know, evidence of mental disease, defect, or disorder is not admissible to negate the capacity to form any mental state, but is admissible solely on the issue of whether the defendant actually formed the required specific intent. With the abolishment of the diminished capacity defense in 1982 by Penal Code sections 25, 28, and 29, mental disorder or defect may no longer be used as a defense to a crime, but may be used to negate an element of the crime, such as specific intent. A defendant may show that

because of Asperger's syndrome or any recognized mental disorder, he did not form the specific intent to solicit to murder, with the jury instructed with CALCRIM No. 3428.[1]

But simply because defendant had the mental disorder of Asperger's syndrome when he was in jail, or that persons with Asperger's are susceptible to manipulation is not sufficient to warrant giving CALCRIM No. 3428. Defendant will always have Asperger's syndrome. Susceptibility to manipulation does not necessarily negate the specific intent to solicit murder. Asperger's has varying symptoms and degrees of impairment, with many adults with Asperger's functioning successfully in society and engaging in purposeful activity. (See Asperger's in Adults <http://www.aspergersinadults. net> [as of Apr. 30, 2012].) Defendant's disorder must have in some way prevented him from forming and acting with the requisite criminal intent for the crime of solicitation of murder. There is no such evidence in this record from any expert witness. *People v. Moore* (2002) 96 Cal.App.4th 1105, 1117 [117 Cal.Rptr.2d 715], explained: "Without expert medical testimony establishing the defendant was suffering from a mental disease, defect, or disorder *at the time of the commission of the crime*, there was no evidentiary or legal basis for the trial court to instruct with CALJIC No. 3.32." (Italics added.)[2] In affirming the refusal to instruct on CALJIC No. 3.32, the court pointed out the expert did not opine the defendant was suffering from a mental disease, defect, or disorder when he stabbed the victim.

Certainly, as the majority notes, an expert cannot testify on the ultimate issue of whether a defendant had the requisite intent at the time he acted. (Pen. Code, §§ 28, 29; *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1364 [58 Cal.Rptr.2d 294].) But an expert can testify as to whether a mental disorder *generally* impairs criminal intent, or testify in response to a hypothetical question that a form of mental illness can lead, for example, to impulsive behavior, without running afoul of Penal Code section 29's admonition. (See *People v. Coddington* (2000) 23 Cal.4th 529, 582–583 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on unrelated ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) Ms. Silver, the defense expert, did neither, because she was not asked to. Indeed, she never mentioned criminal intent in her testimony nor did she generally relate Asperger's syndrome to anything pertinent to the defendant's mental state as he plotted to solicit someone to kill Jane Doe. Counsel tactfully and tactically avoided the issue. Nor did the court prevent counsel from exploring the

---

[1] (See Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2011) Mental Competence, Mental Defenses, and Related Issues, §§ 48.29–48.32, pp. 1590–1594; see especially *id.*, § 48.32, p. 1594 ["evidence of mental disease or defect must be specific enough to support an inference that the defendant did not actually have the required mental state"].)

[2] CALJIC No. 3.32 is the older counterpart to CALCRIM No. 3428.

connection between defendant's Asperger's syndrome and the crime, as was properly done in *People v. Young* (1987) 189 Cal.App.3d 891, 906–907 [234 Cal.Rptr. 819] and *People v. Jackson* (1984) 152 Cal.App.3d 961, 965–970 [199 Cal.Rptr. 848], where the experts testified the criminal acts were the product of mental illness.[3] Defendant's counsel chose not to address the connection between defendant's condition and the charged crime through the expert. And defense counsel did not argue Asperger's impairment, but relied on his innocent game-playing theme.

Ms. Silver did testify defendant "lives in a[n] intellectual fantasy world much of the time." This has little to do with criminal intent and its connection to the crime. An imaginative artist—or a man caught up in the intellectual fantasy world of role-playing games—may actually form and act with specific criminal intent as anyone else. Ms. Silver testified about defendant's Asperger's symptoms in general, including susceptibility to manipulation, without relating the condition to any mental impairment issue at the time of the commission of the crime. The majority states, "Silver specifically testified that defendant is socially naïve and subject to manipulation by others to say things adverse to his own interests." (Maj. opn., *ante*, at p. 826.) This untethered opinion testimony about naïveté and manipulation is not the type of substantial evidence that supports a jury's consideration of CALCRIM No. 3428. Ms. Silver's testimony did not tie defendant's Asperger's syndrome to his mental state at the time of the commission of the crime. As the Supreme Court explained in *People v. Panah* (2005) 35 Cal.4th 395, 485 [25 Cal.Rptr.3d 672, 107 P.3d 790], in concluding the evidence there was insufficient to give CALJIC No. 3.32 (alternative to CALCRIM No. 3428): "At best, Palmer's equivocal testimony established that defendant may have suffered from long-standing latent psychosis and, at some point, his condition deteriorated. This does not constitute evidence of defendant's mental state at the time of the commission of the crime." Similarly, defendant's Asperger's syndrome, with the symptoms as described in the record, is insufficient to establish that defendant somehow did not form and act with the requisite specific intent when he solicited Carlton Wallace and others. A person may be subject to manipulation and still actually form and act with the specific mental intent. Nor was there substantial evidence tying the expert's testimony to the commission of the crime through witness testimony.

There is a paucity of evidence defendant's Asperger's syndrome prevented defendant from forming and acting with the requisite criminal intent to commit the crime of solicitation to warrant CALCRIM No. 3428, which instructs the jury to consider evidence of mental defect or disorder "only for

---

[3] (See 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2009) Opinion Testimony From Expert and Lay Witnesses, § 30.68, pp. 697–698.)

the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." Here, there was insufficient expert testimony and testimony from other witnesses to enable the jury to engage in a meaningful consideration of CALCRIM No. 3428. The jury would have been left to speculate what effect Asperger's had on defendant at the time of the commission of the crime. " 'Substantial evidence is "evidence sufficient 'to deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.' " ' " (*People v. Wilson* (2005) 36 Cal.4th 309, 331 [30 Cal.Rptr.3d 513, 114 P.3d 758], original italics.) The trial court was correct when it refused the instruction because it was under no duty to give an instruction unsupported by substantial evidence. (Cf. *People v. Tufunga* (1999) 21 Cal.4th 935, 944 [90 Cal.Rptr.2d 143, 987 P.2d 168].) Certainly, Asperger's syndrome is a recognized mental impairment that can provide the basis to show a defendant did not actually form the required specific intent. But unlike the reversals in *State v. Burr* (2008) 195 N.J. 119 [948 A.2d 627] and *State v. Boyd* (Mo.Ct.App. 2004) 143 S.W.3d 36, cited by the majority, where those trial courts excluded the defendants' use of Asperger's syndrome evidence to explain the defendants' conduct, the court here did not preclude the defense from developing an Asperger's mental impairment defense regarding specific intent. Nothing was precluded. Defendant chose to use Asperger's syndrome to explain his game-playing defense, not to negate specific intent with sufficient evidence to warrant giving CALCRIM No. 3428.

Let's further examine the evidence. Testimony from witnesses regarding the commission of the crime coupled with expert testimony regarding the actual formation of intent often supports CALCRIM No. 3428. (See fn. 3, *ante.*) But the witnesses did not witness the commission of the crime and could not describe what defendant's mental state was when he carried out his plan. One county jail inmate testified Wallace manipulated defendant and could get him to "say anything he wanted him to say," but offered nothing specific relating to the crime. The testimony is isolated from what actually happened during the commission of the crime. The context of the statement and where it might fit in was never developed. What do we know from the record? Defendant solicited and directed his father and others to carry out his plans without Wallace's involvement. Moreover, there is absolutely no evidence Wallace manipulated defendant when he was solicited for the crime or that Asperger's played any role. How do we know? The solicitation of Wallace was tape-recorded, played for the jury, and belies any role of Asperger's in the solicitation. Investigators fitted Wallace with a recording device. Wallace recorded a conversation with defendant in which the latter detailed the murder plot. The transcript of that conversation does not show Wallace manipulating defendant, but defendant giving Wallace detailed instructions on how to dispose of Jane Doe. In the recorded conversation,

defendant tells Wallace: "[W]hat I was thinking is you go into my dad's garage . . . . You grab three tie-down straps . . . . And the three tie-down straps, you put 'em, you put her feet in . . . fetal position. You tie one around one knee, one around her shin, and you crank down." Wallace asks, "While she alive?" Defendant replies, "Fuck no. When she's dead. You crank down, crank down, crank down. Get her as small as possible, right?" He continues explaining that once Jane Doe is "compact" Wallace should put her in the "tub"—presumably the trough—in the bottom of the hole ("put her one thirty pound ass in"), then fill it with concrete. Wallace asked what he should do if there was no concrete at the farm. Defendant replied, "I'll . . . just have dad go get it." The recording in its totality shows scant evidence of Asperger's syndrome playing any part in preventing defendant from acting with his own considered intent to solicit and use Wallace to kill Jane Doe.

Often the mental state defense to negate specific intent is presented to the jury through an expert and the testimony of the defendant himself about his mental state at the time he committed the crime. Penal Code sections 28 and 29 do not prevent a defendant from describing his actual mental state at the time of the alleged crime to show that he acted without specific intent. Defendant testified as the centerpiece of his case and did not implicate Asperger's syndrome. He testified he was only involved in a role-playing fantasy game orchestrated by Wallace and did not have any real plans to kill Jane Doe. He said he was intending to play a game. He did not suggest that because of Asperger's his mental state was such that he did not form or act with the specific mental intent to solicit a murder when he engaged Wallace. He did not suggest Wallace manipulated him to the point that his mental state was such that he did not form and act with specific intent.

During pretrial proceedings regarding Ms. Silver's testimony, defense counsel explained the purpose of her testimony was to explain Asperger's syndrome and did not offer her testimony as to how the mental disorder might affect specific intent. Nor when instructions were discussed did defense counsel explain why the evidence supported giving CALCRIM No. 3428 or how it fit into the theme of the defense case. Counsel did not advocate for the instruction, despite tepidly requesting it. Finally, in opening statement and during closing argument, defense counsel did not argue Asperger's syndrome prevented defendant from actually forming and acting with the specific intent. Counsel was free to do so in the context of CALCRIM No. 252, an instruction read to the jury, requiring the People to prove that a person not only intentionally committed the prohibited act, but did so with a specific intent that is explained in the instruction for the crime. Defense counsel did not argue Asperger's impairment concerning the mental state for specific intent because the defense was defendant was playing a fantastical game and did not plan to kill Jane Doe, but some fantasy character.

CALCRIM No. 3428 should be given when there is substantial evidence from expert testimony, or the testimony of the defendant, or the testimony from witnesses that address the defendant's mental state at the time of the commission of the crime. The record in this case shows defendant has Asperger's syndrome and will always live with it with its attendant social problems. Persons with mental disorders or disease or chronic alcoholism will always have their personal challenges and live their lives with the help of support, self-awareness, medication and therapy. But they are not excused from the consequences of criminal behavior because they have a mental disorder. The law requires substantial evidence that the disorder prevents the defendant from actually forming and acting with the requisite specific intent when he commits the crime. Snippets of untethered testimony are not sufficient.

I concur in the affirmance of the judgment. I respectfully dissent from the finding of judicial error regarding CALCRIM No. 3428.

Appellant's petition for review by the Supreme Court was denied August 8, 2012, S203039.