Filed 7/24/15  P. v. Hernandez-Betancourt CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDGAR L. HERNANDEZ-BETANCOURT,<br><br>        Defendant and Appellant. | A141070<br><br>(Marin County<br>Super. Ct. No. SC184337A) |

A jury convicted defendant Edgar L. Hernandez-Betancourt of second degree robbery of a check-cashing store, and the court sentenced him to three years in prison. (Pen. Code, § 211.) Defendant testified he was coerced into using drugs and robbing the store and claims on appeal that the jury was required to accept his duress defense in the absence of countervailing evidence. Defendant also claims the court did not adequately respond to the deliberating jury's question concerning coerced drug use and that a proper response would have included an instruction that involuntary intoxication may negate intent to commit robbery. We shall affirm the judgment upon concluding that the jury was free to reject defendant's testimony as not credible and to draw inferences from the evidence presented by the prosecution to find defendant acted freely, not under duress, and that failure of the court to respond to the jury's question with an instruction on involuntary intoxication was not prejudicial.

1

**Evidence Presented at Trial**

*The Prosecution's Case*

On April 6, 2013, Areli Mazariegos was working in Novato as a cashier at Luna Travel, a store that offers check cashing, money orders, airplane tickets and related services. She testified that she was alone in the store when, around 6:00 p.m., a man ran into the store and approached her as she sat at a computer behind the counter. Mazariegos said the man, later identified as defendant, "had his face covered" and wore gloves.

Mazariegos testified that defendant repeatedly yelled at her to give him money, coming closer to her and yelling louder with each demand. He then climbed on top of the counter, stood over Mazariegos, reached into his pocket, and threatened to kill her if she did not give him the money. Mazariegos feared defendant was reaching for a gun and would kill her if she did not comply with his demands. She pulled money from a cash box and handed the money to defendant, who grabbed it from her. Mazariegos testified: "I gave him all the money I had," which was over $1,000. Defendant "wouldn't go." He demanded more money and again threatened to kill Mazariegos. She showed defendant the empty cash box and defendant ran from the store. Mazariegos was upset and came outside the store yelling that she had been robbed.

A video from the store's surveillance cameras was admitted in evidence. The video has a split four-part screen depicting locations inside and outside the store. The video has no audio. It shows a man wearing a thick hooded jacket, gloves and a dark cloth over the lower part of his face. The man, with his head lowered, runs into the store to a long desk or low counter at the rear of the store, leans across the counter, and makes rough jerking motions with his right hand while using his left hand to hold down his hood. The cashier reacts with outstretched empty hands, palms up. This exchange lasts for about one minute. The man then puts one foot on a chair, steps up, and places a knee on the counter. The cashier takes money from under the counter and the man reaches out and grabs it from her. The man gestures for more, waving his right hand and reaching further over the counter. The cashier hands another wad of cash to the man, then she gestures again with open hands. This happens at least six times over the course of a

minute — the man waves his right hand with a raking motion and the cashier gestures with open hands then produces another wad of money. The man grabs each packet of money produced and stuffs it into his jacket pockets. Finally, the cashier shows an empty cash box to the man and he leaves the store.

Wender Arruda was a customer of Luna Travel and testified that he was approaching the store as defendant ran out wearing a hooded sweatshirt or jacket. Defendant pulled his hood over his head and lowered his head so that Arruda could not see defendant's face. Defendant ran down the street. Hearing Mazariegos's call for help, Arruda got into his car and followed defendant. Arruda kept defendant in sight and, when defendant turned a corner and slowed his pace from a run to a walk, Arruda drove his car onto the sidewalk in front of defendant. Defendant started running again and Arruda followed him on foot. Arruda caught defendant, punched him in the head, brought him to the ground, and sat on top of him while holding his arms behind his back. Arruda held defendant on the ground until a police officer arrived. Arruda testified that defendant seemed "pretty drunk or intoxicated from drugs" because "[h]e was kind of off balance" when he ran and did not run "fixed in one direction." Arruda also testified that several men were in the area when he was detaining defendant, including a homeowner who called the police and a Latino bicyclist. Defense counsel asked Arruda if the bicyclist appeared to be on drugs and Arruda said no. Asked if the bicyclist was "definitely watching what was going on," Arruda answered "[c]ould be that, or curiosity."

A police officer arrived on the scene to find Arruda holding defendant on the ground, surrounded by "a large group" of onlookers. Money was falling from defendant's jacket pockets. A total of $1,169 in cash was recovered from his person. A black glove and scarf were found near defendant in the parking lot. The police brought Mazariegos to the site of defendant's detention, about a block from the store, and she identified him as the robber based on his clothing. She also recognized defendant as a prior customer of the store.

*The Defense*

Defendant claimed he acted under duress and robbed the store because a man named "Horatio" threatened to kill him or his son if he did not do as demanded. Defendant testified that he met Horatio a couple weeks before the robbery. The day before the robbery, Horatio came into defendant's home and stole birthday gifts defendant intended to give his son, who lived with defendant's estranged girlfriend. His son's birthday was the day of the robbery. On the morning of that day, defendant was walking down the street with plans to meet his mother, buy a birthday cake, and see his son. Defendant saw Horatio standing in front of the apartment building where Horatio lived. Defendant told Horatio he would "give him $50 for him to return [to] me the toys for the child." Horatio said he had the toys upstairs in his apartment and defendant went with him to get them.

Defendant entered the apartment, which "belong[ed]" to an "American" man. Once inside the apartment, Horatio took a knife from his pocket, pointed it at defendant and, with a pipe in his other hand, ordered defendant to smoke crack cocaine. Horatio told defendant "if I didn't smoke that he was going to kill me." Defendant testified he did not want to smoke but, under threat of death, did so. Defendant said he, Horatio and the American sat in the apartment smoking crack for seven hours, from 10:00 a.m. to 5:00 p.m.

At 5:00 p.m., Horatio said he wanted to go to a store for food. Horatio and defendant were walking to the store when they met another man, Francisco Rodas. Horatio and Rodas took defendant into a parking lot where they gave him more drugs, punched him in the stomach, took off his pants and underwear, threw him to the ground, and sodomized him. The assault lasted for about 30 minutes. After the assault, defendant dressed and the three men proceeded toward the food store.

Across from the food store is Luna Travel. When the men came near Luna Travel, they told defendant "if I didn't step into the store and rob it that I was no longer going to be seeing my family again." They threatened to "kill me or my child." Defendant believed the threats "because these are bad people." Defendant went into the store while

4

Horatio and Rodas waited outside. Defendant testified that he has "almost no recollection of anything" after entering the store and only remembers being held by Arruda and surrounded by police. He said that, while on the ground being detained by Arruda, he saw Horatio nearby on a bicycle. On direct examination, defendant could not say why Horatio was on a bicycle. On cross-examination, defendant said Horatio brought the bicycle with him when he and Horatio left the apartment to go to the food store.

Two character witnesses testified for the defense. Yadira Virgil, a psychotherapist, testified that defendant did occasional gardening for her and was always honest, respectful and on time. In her opinion, defendant is "a peaceful person." Virgil was told that defendant was convicted for battery in 2011 but the fact did not change her opinion. Romina Dagnino, the godmother of defendant's son, testified that defendant is an honest and peaceful person. She did not change her opinion after learning of defendant's battery conviction.

## Discussion

1. *Substantial evidence supports the verdict*

Defendant did not deny taking money from the store's cashier by threat of violence but claimed he did so under duress. At defense counsel's request, the jury was instructed: "The defendant is not guilty of robbery if he acted under duress. The defendant acted under duress if, because of threat or menace, he believed that his or someone else's life would be in immediate danger if he refused a demand or request to commit the crime. The demand or request may have been express or implied. [¶] The defendant's belief that his or someone else's life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. [¶] A threat of future harm is not sufficient; the danger to life must have been immediate. [¶] The People must prove beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty of Robbery." (CALCRIM No. 3402.)

5

Defendant contends that the People's burden of proof was not met because the prosecutor did not present "actual evidence" contradicting defendant's testimony that he robbed the store under duress but "merely argued in closing that [defendant's] story was unbelievable." The prosecutor argued to the jury that defendant "lied" and fabricated a story that was "outlandish," "preposterous," "completely ludicrous," and incongruous. The prosecutor asked the jury to consider why Horatio, if he exists, "would want to spend money on narcotics to give someone that they've only known two weeks, let alone make them smoke it at knifepoint," why Horatio would take defendant from the seclusion of an apartment to a public parking lot to commit a sexual assault, and how the claimed 30-minute assault on a Saturday afternoon in downtown Novato would be unseen.

The prosecutor was entitled to challenge defendant's credibility and the jury was entitled to disbelieve his testimony. The jurors, as they were rightly instructed, "must judge the credibility or believability of the witnesses" and "may believe all, part, or none of any witness's testimony." (CALCRIM No. 226.) "In passing on the credibility of witnesses and the weight to be given their testimony, the trier of fact is entitled to consider [the witnesses'] interest in the result of the case, their motives, the manner in which they testify, and the contradictions appearing in the evidence." (*Huth v. Katz* (1947) 30 Cal.2d 605, 609.) A jury may disbelieve a defendant's testimony even in the absence of countervailing evidence. (*People v. Wiest* (1962) 205 Cal.App.2d 43, 46.)

Moreover, the prosecution's case did not rest entirely upon an attack on defendant's credibility. The store's surveillance camera video and testimony of Mazariegos and Arruda constitutes substantial evidence of the robbery and of the *manner* in which the robbery was committed, permitting an inference that defendant did not act under duress. In closing argument, the prosecutor discussed the evidence presented and inferences to be drawn from it. The prosecutor argued that defendant could not have been acting under a threat made just minutes before entering the store because he was dressed for the robbery, with a hooded jacket, scarf and gloves inappropriate to the weather on an April day in Marin County. Also, the prosecutor argued, defendant did not take the first packet of money handed to him and leave but repeatedly demanded more money because

6

"he knows that money is for him. That's why he wants every last bit that's in that drawer." The prosecutor argued, "if you're under duress . . . why do you care so much how much money you come out with? You don't. And the only reason you're doing that and you're getting all that money is because it's for you." The jury was free to reject defendant's testimony and to rely upon the evidence presented by the prosecution to conclude that defendant acted freely, not under duress.

2. *The court's failure to respond to the deliberating jury's question about drug use with an instruction on involuntary intoxication was not prejudicial.*

Defendant claims the court did not adequately respond to a question submitted by the deliberating jury and that a proper response would have included an instruction that involuntary intoxication may negate intent to commit robbery.

An hour after the start of jury deliberations, the jury submitted the following question: "Want to know if you were under duress to take mind altering drugs are you responsible for subsequent actions?" The jury also asked to watch the store's surveillance camera video again. The court provided the video to the jury and, while jury deliberations continued, assembled defendant and the attorneys to discuss the question about drugs and duress. The court said it did not think further instruction was required and the prosecution agreed. Defense counsel asked that the duress instruction be modified to add involuntary intoxication as a factor.[1] The prosecutor objected to the proposed instruction as confusing two separate defenses: duress and involuntary intoxication. The prosecutor argued that defendant never claimed his involuntary intoxication prevented him from forming the intent to permanently deprive Luna Travel of its money; he claimed only that he acted in

---

[1] Defense counsel suggested the following modification to the standard instruction on duress: "The defendant's belief that his or someone else's life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. *Involuntary intoxication is one of the factors you should consider when considering all of the circumstances as they were known to and appear to the defendant and considering what a responsible person in the same position as the defendant would have believed.*"

7

response to the threat of harm to him or his child if he did not enter and rob the store. The prosecutor also noted that defendant did not request a jury instruction on involuntary intoxication when the case was submitted. Defense counsel argued that the jury's question showed involuntary intoxication to be "relevant to their inquiry" as they asked about intoxication's "impact on criminal liability." She asked for either a modified instruction on duress or a standard instruction on involuntary intoxication.[2] The court refused the requests and referred the jury to the standard instruction on duress. The jury returned a verdict within one hour of receiving the court's response to its inquiry.

Defendant contends an instruction on involuntary intoxication should have been given because there was substantial evidence to support it and defense counsel requested it, albeit only after the jury's inquiry on the subject. The Attorney General concedes there was substantial evidence of intoxication under duress but argues there was no substantial evidence that intoxication negated defendant's intent to steal. "Told to steal, [defendant] entered Luna Travel for that purpose," the Attorney General maintains. "In this case, the only evidence was [defendant's] testimony that he entered the agency to commit robbery."

The evidence concerning defendant's intent is not as clear as the Attorney General contends. The defendant did not testify that he entered the store "to commit robbery." On direct examination, defendant testified that Horatio and Rodas told him "if I did not go into the store that — that they were going to kill me or my child." "Q. So what did you do? A. Well, I had to go in. Q. What were you planning to do when you went inside? A. Once I stepped in I have almost no recollection of anything else. Q. Can you explain? A. I just remember stepping in. Q. Is that all? A. I hardly remember anything else. Q. But what is the next thing you remember? A. What I remember is that — I just remember that

---

[2] "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required intent or mental state when he acted. [¶] A person is involuntarily intoxicated if he unknowingly ingested some intoxicating liquor, drug, or other substance, or if his intoxication is caused by the duress of someone else, for whatever purpose, without any fault on the part of the intoxicated person." (CALCRIM No. 3427.)

I saw a bunch of cops all around me." On cross-examination, the prosecutor did not ask defendant about his intent, only his actions. "Q. And then one of these individuals told you to go in and rob Luna Travel, correct? A. Yes. Q. And you ran in and you're the one on the video that we've been watching, isn't that true? A. Well, yes. Q. And you're the one who had a significant amount of currency in his pocket when he was arrested and had stolen from Luna Travel, true? A. I don't remember that."

Intoxication bears on the question of whether the defendant had the requisite mental state to commit the charged crime. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) An instruction on intoxication should be given where supported by the evidence and requested by the defense. (*Ibid.*) Here, defendant's testimony about being coerced at knifepoint to smoke cocaine, and Arruda's testimony that defendant appeared "pretty drunk or intoxicated from drugs" when he apprehended him, provided a factual basis for an instruction on the significance of involuntary intoxication. Had such an instruction been timely requested, under CALCRIM No. 3427, the jury should have been instructed to "[c]onsider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required intent or mental state when he acted."

We need not decide whether it was error not to have added such an instruction in response to the jury's question, when the defense had never argued that defendant was acting under the influence of drugs when he entered the store, because in all events the failure to give the requested instruction was not prejudicial. The instruction requested was a "pinpoint instruction" relating particular facts to a legal issue in the case. (*People v. Saille, supra,* 54 Cal.3d at p. 1119.) Failure to give a pinpoint instruction is reviewed for prejudice under the harmless error standard. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829-831.) Even if erroneous, the judgment is subject to reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Our evaluation "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the

existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) "We also consider the instructions as a whole, the jury's findings, and the closing arguments of counsel." (*Larsen, supra,* at p. 831.)

There is no reasonable probability that defendant would have been acquitted had the jury been instructed on involuntary intoxication. Defendant's testimony was highly implausible and at odds with the video, which shows a man with the foresight to wear clothes to conceal his identity and sufficiently conscious to climb onto a counter and repeatedly demand money until certain he has received everything from the cash box. A claim of involuntary intoxication, like the claim of duress, would have rested on defendant's testimony that a man named Horatio coerced him into smoking crack cocaine and robbing the store. The jury rejected his claim of duress and, in doing so, necessarily found defendant's testimony not credible. It is not reasonable to suppose that the jury would have rejected the testimony that he was forced to rob the store and yet have accepted the testimony that he was forced to smoke crack and, under its influence, did not intend to rob the store. Moreover, the jury understood that it could not convict defendant unless he had the capacity to form intent, and formed intent, because it was instructed that robbery requires the union of act and wrongful intent, and that intent must be the specific intent "to deprive the owner of [property] permanently." (CALCRIM Nos. 251, 1600.) On the facts and instructions given, it is not "reasonably probable that a result more favorable to the appealing party would have been reached" had the instruction been given. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

## Disposition

The judgment is affirmed.

10

                     _____

                     Pollak, Acting P.J.

We concur:

_____

Siggins, J.

_____

Jenkins, J.