Filed 3/17/22  P. v. Lundberg CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074551 |
| v. | (Super.Ct.No. RIF098081) |
| JANET LOUISE LUNDBERG, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Godofredo Magno, Judge.  Affirmed.

Law Offices of Sarah A. Stockwell, and Sarah A. Stockwell for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sedival, Collette Cavalier and Andrew S. Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Penal Code section 1473.7, subdivision (a)(2) allows a person no longer in criminal custody to file a motion to vacate a conviction based on newly discovered evidence of actual innocence. Defendant and appellant Janet Lundberg filed such a motion, contending that her 2014 diagnosis of Asperger's Syndrome showed she was actually innocent of 14 sex crimes committed against two teenage boys in 2001. The trial court denied the motion, and we affirm, finding that the fact that Asperger's Syndrome was diagnosable at the time she was charged and convicted, and that she pled guilty to the crimes, show that she has not brought forward newly discovered evidence of actual innocence.[1]

## I. BACKGROUND

At a preliminary hearing held in December 2001, an officer testified that he had interviewed two boys about potential sexual abuse from Lundberg. One of the boys, J.M. (age 15), stated he had vaginal intercourse with Lundberg on three occasions, oral intercourse on four occasions, and that Lundberg had touched his penis with her hands on two occasions. The other boy, M.K. (age 13), stated he had oral intercourse with Lundberg on four occasions and vaginal intercourse on one occasion. The officer had interviewed Lundberg and testified that Lundberg told him that she had sexual intercourse with the boys on several occasions. According to a July 2001 police report, Lundberg stated she "had feeling[s]" for J.M. and that "she sort of liked [M.K.] but not as strong as [J.M.]."

---

[1] Undesignated statutory references are to the Penal Code.

Lundberg was charged with four counts of lewd and lascivious acts with a child under 14 (§ 288, subd. (a)), four counts of lewd and lascivious acts with a child 14 or 15 and at least 10 years younger than the offender (§ 288, subd. (c)(1)), five counts of unlawful oral copulation with a minor (former § 288a, subd. (b)(1)), and one count of sodomy with a person under 16 (§ 286, subd. (b)(2)).

According to an affidavit from Lundberg in 2001, J.M. and M.K. were the true aggressors and she was the victim. She described several incidents where one or both of the boys initiated sexual contact with her. For instance, she noted that one time J.M. "came into my house when I was cleaning my bedroom. He found me there and got close to me and roughly touched me in my private areas and then yanked off my clothes. He then pulled or pushed me to the floor, he got over me and started to press his penis against me close to my vagina. I said, 'No, you better not do this.' He didn't care that I said no and pulled down my underwear and forced it in anyway." She stated that J.M. and M.K. "would force me into having sex with them even though I'd say 'No' and I would do it because I was scared and intimidated by them. With my extremely shy nature and not knowing them well, I felt like I wasn't tough enough to have authority over them."

Two psychiatrists and a psychologist each evaluated Lundberg in preparation for her trial, although only one psychiatrist's report is part of our record. That report characterized Lundberg as a "painfully shy and somewhat withdrawn young woman who is quite fearful of the world around her. She is easily intimidated, and her personality

3

pattern reflects someone with a passive-dependent personality. She is not assertive and does not deal effectively with conflict." The psychiatrist believed that Lundberg "fulfills the criteria for Major Depression, Moderate" as well as "Passive and Dependent Personality Features."

In 2004, some three years after she was charged, and apparently on the second day of trial following the trial court's rulings on motions in limine, Lundberg pled guilty to all charges. Lundberg was sentenced to one year in jail followed by five years of probation.

In 2019, Lundberg filed a motion to vacate her conviction due to actual innocence along with another declaration. In her declaration, Lundberg stated that in 2014 she had been "diagnosed with an Autism Spectrum Disorder, also known as Asperger's Syndrome" and that as a result of the disorder, she is "frozen with fear" whenever she is in a situation where she has to "challenge another person." She described J.M. and M.K. as "physically bigger and stronger" than she was, and that on one occasion J.M. "shot [her] goats, fatally injuring one of them." That incident made Lundberg fearful of J.M. and "showed [her] that he was capable of hurting [her] and [her] children." She continued:

"8. The first time [J.M.] went too far was one day when I was cleaning out the garage. He came in and asked if he could help me. I was grateful for the help, so I said yes. We worked together for some time, talking as we went, and then he suddenly grabbed me, touching me inappropriately and hugging me. I didn't tell him to stop because I thought it was just a friendly hug.

4

"9.  [J.M.] continued making sexual advances to me.  When I asked him why he was doing this to me, he told me his 'hormones were going' and that I was pretty.  He simply would not take no for an answer.  Another incident occurred while I was picking fruit in the orchard.  [J.M.] came out to where I was and he forced me into an empty chicken coop nearby and raped me.

"10.  Another incident occurred in my bathroom.  [J.M.] came into my bedroom and stood in the doorway to the bathroom, blocking my exit.  This time he used [M.K.] as a lookout at the master bedroom door.  He forced me to have sex with him, even though I told him to stop.

"11.  The last incident occurred in some brush near the house.  I was scared of what [J.M.] would do if I did not meet him in the brush, so I did what he said.  I went out to the brush and both [J.M.] and [M.K.] took turns raping me.  I was unable to fight back because I was afraid for my children and did not know what [J.M.] would do to them.  After these charges were filed, I learned from a friend that he had attempted to rape my 12-year-old daughter, confirming my fears that he was a threat to my children.

"12.  When the police came to my home, I was caught off guard.  There were two officers in plain clothes and they sat on either side of me while they taped our conversation.  I was scared and my anxiety kicked in, causing me difficulty to find the right words to explain what happened.  When I could not find my words, they finished my sentences for me.  I told them I said no and did not consent to these encounters, but I

don't think I used the right words because they arrested me when we finished.  They also told me to take them to the locations where the incidents happened, which I did.

"13.  I did not consent to any of the incidents involving either [J.M.] or [M.K.].  Due to my [Autism Spectrum Disorder], I was unable to fight back and unable to stop them or even protect my children from them.  I realize now I should have done more to protect myself and my family, but I could not at the time and I did not know why.  Now I know why and I make efforts to speak up for myself, but it is a slow process trying to combat the [Autism Spectrum Disorder] symptoms I face every day."

Following opposition from the People and a hearing, the trial court denied the motion.

## II.  DISCUSSION

Lundberg contends on appeal, as she did in trial court, that "her recent diagnosis of Asperger's Syndrome is new evidence of her innocence" entitling her to relief under section 1473.7, subdivision (a)(2).  We conclude she has not satisfied the statute's requirements.

*A.  Applicable Law and Standard of Review*

Section 1473.7, subdivision (a) provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction or sentence" for certain specified reasons.  One such reason, described in subdivision (a)(2), is that "[n]ewly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice."  Section 1473.7, subdivision (e)

6

states that when ruling on the motion, "[t]he court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any" of the specified grounds for relief.

Section 1473.7 does not expressly state the governing standard of review on appeal. In *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), our Supreme Court recently addressed section 1473.7 motions asserting a different reason for relief, provided in section 1473.7, subdivision (a)(1) and relating to errors affecting a party's ability to understand the adverse immigration consequences of a plea of guilty or nolo contendere. After noting that the standard for reviewing motions under section 1473.7 in general is "'unsettled,'" *Vivar* concluded that the independent review standard applied. (*Vivar*, *supra*, at pp. 523-528.)

Section 1473.7, subdivision (a)(2) motions asserting actual innocence were not before our Supreme Court in *Vivar*, so it is not entirely clear whether the independent review standard applies to such motions as well as those brought under subdivision (a)(1). Certain portions of its analysis on this issue address section 1473.7, subdivision (a)(1) specifically, while others more broadly refer to section 1473.7 as a whole. (E.g., compare *Vivar*, *supra*, 11 Cal.5th at p. 524 [accepting Attorney General's concession "to apply the independent standard of review to *all* prejudice determinations under section 1473.7, subdivision (a)(1)"] with *id.* at p. 527 ["So our embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on

7

which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence"].)

Here, we apply *Vivar*'s independent review standard to Lundberg's section 1473.7 motion asserting actual innocence. As we explain, Lundberg has not shown that her conviction should be vacated even on an independent review, and our conclusion accords with that of the trial court. Accordingly, it does not matter whether she would be entitled to relief under a standard more deferential to the trial court's reasoning or findings.[2]

### B. Diagnosis of Asperger's Syndrome

Lundberg contends that her diagnosis of Asperger's Syndrome demonstrates that she is not capable of fighting off an attacker. She acknowledges that Asperger's Syndrome was already a recognized disorder at the time her criminal case was pending. She also notes that she had been examined by mental health experts in advance of her trial and that none diagnosed her with Asperger's Syndrome. Lundberg contends that the lack of earlier diagnoses do not change the fact that the diagnosis now exists, and that her

---

[2] *Vivar* noted that independent review is not the same as de novo review, and that de novo review is even less deferential than independent review when factual findings based on the trial court's "personal observations of witnesses" are involved. (*Vivar*, *supra*, 11 Cal.5th at p. 528; see *id.* at p. 527 [under independent review, "[a]n appellate court may not simply second-guess factual findings that are based on the trial court's own observations"]; *In re George T.* (2004) 33 Cal.4th 620, 634 ["Independent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different"], cited in *Vivar*, *supra*, 11 Cal.5th at p. 527.) Here, the trial court was never asked to make factual findings based on witnesses it personally observed, so the two standards of review are functionally equivalent for our purposes.

Asperger's Syndrome explains her inability to fight back against the boys and accordingly proves her innocence. We disagree.

Section 1473.7 "does not define the phrase 'newly discovered evidence,' [but] the phrase has been defined elsewhere in the Penal Code. [Citations.] Those definitions consistently describe newly discovered evidence as testimony, writings and similar things described in Evidence Code section 140 (which defines 'evidence'), *discovered after trial or judgment, and that with reasonable diligence could not have been discovered earlier.*" (*People v. Perez* (2020) 47 Cal.App.5th 994, 999.)

For two reasons, Lundberg's diagnosis does not entitle her to relief here. First, the posttrial expert testimony (Lundberg's diagnosis) was not newly discovered evidence because it reasonably could have been discovered earlier. Asperger's Syndrome was a recognized disorder at the time of trial, and all the facts to support a diagnosis were either known or available to the experts who then examined her. Indeed, the experts who examined Lundberg actually addressed facts that generally could support such a diagnosis (such as the fact she was "painfully shy and somewhat withdrawn"), though they did not label the diagnosis as Asperger's.

Our courts have held that expert testimony about available facts do not constitute new evidence, albeit in different contexts such as a motion for new trial or a petition to modify juvenile court orders. (See *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 255 ["Depasquale's April 5 declaration purporting to reach new opinions based on this evidence was not, itself, new evidence. Depasquale had the materials he needed to reach

9

his April 5 conclusion before the summary judgment hearing.  Those opinions should have been timely presented but were not"]; *People v. Soojian* (2010) 190 Cal.App.4th 491, 513 ["We agree with the trial court that the expert testimony proffered by Soojian could have been, and perhaps should have been, presented at trial.  Each of these issues was known before trial, and Soojian had adequate time before trial to locate and retain experts on these topics"]; *In re H.S.* (2010) 188 Cal.App.4th 103, 105-106 ["[T]he term 'new evidence' in [Welfare & Institutions Code] section 388 means material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered.  Here, appellant's [Welfare & Institutions Code] section 388 motion relied on an expert opinion that was not based on any new evidence, but on the same evidence available to the experts who testified at trial.  The new expert simply came to a different conclusion that, with due diligence, could have been presented at the jurisdiction hearing"].)

Similarly, other states have generally—if not uniformly—held that such testimony is not newly discovered evidence.  (See, e.g., *State v. Blasus* (Minn. 1989) 445 N.W.2d 535, 543 ["Generally expert testimony does not constitute newly discovered evidence justifying a new trial"]; *People v. McSwain* (Mich. Ct. App. 2003) 259 Mich.App. 654, 687 ["Failure to recognize a reasonably discoverable mental illness is not enough to require a grant of postjudgment relief"]; *T.M. v. State (State ex rel. L.M).* (Utah Ct. App. 2003) 68 P.3d 276, 279, fn. 3 ["While the question of whether a post-trial expert opinion interpreting evidence submitted during the trial constitutes 'newly discovered

evidence' . . . has yet to be addressed in Utah, in light of the conclusions reached by other courts, it is possible that we would conclude such opinions do not constitute 'newly discovered evidence'"]; *State v. Fosnow* (Wis. Ct. App. 2000) 240 Wis.2d 699, 716 ["new expert opinions obtained postconviction do not qualify as newly discovered evidence regarding a defendant's mental responsibility for a crime"]; *Gray v. State* (Conn. App. Ct. 1999) 51 Conn.App. 689, 692 ["The petitioner's expert testimony, which could have been presented at the first trial to support his case, is not newly discovered material"]; *Sellers v. State* (Okla. Crim. App. 1995) 889 P.2d 895, 897, fn. 11 ["Trial counsel could have, with due diligence, discovered evidence of [defendant's] brain damage and [multiple personality disorder] prior to trial. Accordingly, it was not 'newly discovered' and would not warrant a new trial"].) Lundberg has given us no reason to conclude otherwise here.

Lundberg's contentions otherwise on this point are unconvincing. She argues, for instance, that her diagnosis is newly discovered evidence in the same way that the results of a DNA test or of an MRI scan are "newly discovered" at the time the tests are performed and the results reported. As she contends, if the tests are performed only years after the fact, then they become evidence only beginning at that point. Whether or not this is true, it is beside the point, as the newly discovered evidence in a section 1473.7 motion must not have been discoverable earlier with reasonable diligence. (*People v. Perez*, *supra*, 47 Cal.App.5th at p. 999.) Lundberg's hypotheticals do not address the

11

problem here, which is that there is no satisfactory explanation for why she was not diagnosed with Asperger's Syndrome while her case was pending.

Second, we are not persuaded that the diagnosis of Asperger's Syndrome means that Lundberg was actually innocent of all (or any) of the fourteen sex crimes to which she pled guilty. "A guilty plea . . . concedes that the prosecution possesses legally admissible evidence sufficient to prove defendant's guilt beyond a reasonable doubt." (*People v. Turner* (1985) 171 Cal.App.3d 116, 125.) She pled guilty when she knew the underlying facts of the incidents, her intent at the time, and the elements of the offenses.[3] Even if we were to accept that her Asperger's Syndrome diagnosis is newly discovered evidence, she has offered no reason why we should not accept at face value her earlier admission of the sufficiency of the evidence to demonstrate her guilt. That is, we might even accept that an Asperger's diagnosis would give her an extra jury argument to be made at trial, so (perhaps) it would even provide a tactical reason for her to test the case at trial rather than plead guilty. Yet the diagnosis still falls short of demonstrating that she was actually innocent of the crimes, which is her burden here.

---

[3] Moreover, the record does not indicate that the plea was a so-called "*Alford* plea," where a defendant maintains his or her innocence but pleads guilty "because the defendant (1) is expecting a favorable recommendation from the prosecution, and (2) believes that if the case were tried, there is a likelihood that he would be convicted." (*People v. Roberts* (2011) 195 Cal.App.4th 1106, 1121; see *North Carolina v. Alford* (1970) 400 U.S. 25; *People v. Roberts, supra*, at p. 1122 [under an *Alford* plea, the defendant does not "admit[]the underlying facts of the charged offense"].)

12

Accordingly, on this record, we conclude that Lundberg has not shown by a preponderance of the evidence that there is newly discovered evidence of actual innocence.[4]

### III.  DISPOSITION

The trial court's denial of Lundberg's motion to vacate the conviction under section 1473.7 is affirmed.

RAPHAEL _____

J.

I concur:

MILLER _____

Acting P. J.

---

[4] Given our conclusions as to the merits of Lundberg's motion, we need not consider the People's separate contention that the motion was untimely.

13

[*People v. Janet Lundberg*, E074551]

CODRINGTON, J., concurring.

I concur in the majority's affirmance of the trial court order denying defendant's motion to vacate defendant's conviction based on new evidence of defendant's diagnosis of Asperger's Syndrome (Aspergers), which is now classified as an Autism Spectrum Disorder (ASD) diagnosis.[1] However, I wish to emphasize in this concurrence the potential significance of such a diagnosis, which may justify a different result if there has not been any previous expert evidence establishing the underlying behaviors and traits upon which the diagnosis is based. I agree with the majority opinion, here, that defendant's Aspergers diagnosis does not constitute newly discovered evidence of innocence under Penal Code section 1473.7(a)(2) because there was substantial pre-conviction evidence provided by mental health experts demonstrating manifestation of those same behaviors and traits upon which defendant's Aspergers diagnosis was based.

Defendant pled guilty in 2004 and was convicted of 14 counts of sexual offenses against two teenage boys, who were 13 and 15 years old. The offenses included the crimes of lewd and lascivious acts with a child under 14 (Pen. Code, § 288, subd. (a)), lewd and lascivious acts with a child 14 or 15 and at least 10 years younger than the offender (Pen. Code, § 288, subd. (c)(1)), oral copulation with a minor (former Pen. Code, § 288a, subd. (b)(1)), and sodomy with a person under 16 (Pen. Code, § 286, subd.

---

[1] When referring to Aspergers in this concurrence, as regards to defendant, I recognized that her diagnosis falls within the more expansive diagnosis of ASD.

1

(b)(2)). At the time of defendant's conviction, she had not been diagnosed with Aspergers Syndrome or ASD. "Asperger's is a 'high-functioning variant of Autism,' which manifests itself primarily in social dysfunction." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 821 (*Larsen*).)

Defendant contends on appeal, as she did in her motion to vacate her conviction, that her post-conviction diagnosis of Aspergers in 2014 constitutes new evidence of her innocence, entitling her to relief under Penal Code section 1473.7 (a)(2). The majority opinion concludes defendant has not shown by a preponderance of the evidence that defendant's Aspergers diagnosis in 2014 qualifies as newly discovered evidence of actual innocence.

Penal Code sction 1473.7, subdivision (a) provides in relevant part that "A person who is no longer in criminal custody may file a motion to vacate a conviction or sentence for any of the following reasons: [¶] . . . [¶] (2) Newly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice." Under subdivision (e) of Penal Code section 1473.7, "[w]hen ruling on the motion: [¶] (1) The court shall grant the motion to vacate the conviction or sentence if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a)."

While I concur with the majority opinion disposition affirming the order denying defendant's motion to vacate her conviction, I do so, not because of the view that Aspergers has little, if any, relevance or significance when evaluating a defendant's

2

behavior or mental state. To the contrary, Aspergers can be highly relevant to the determination of whether a defendant has committed a criminal offense. The fact that a defendant suffers from Aspergers may be determinative of whether he or she possesses the requisite mental state or intent to commit a charged crime, and whether the defendant is even capable of committing the crime.

"'Asperger's Disorder is [defined as] an autism spectrum disorder characterized by a "severe and sustained impairment in social interaction . . . and the development of restricted, repetitive patterns of behavior, interests, and activities." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders 75* (4th ed. 1994) (DSM-IV); see also National Institute of Neurological Disorders and Stroke, Asperger Syndrome Fact Sheet, http://www.ninds.nih. gov/disorders/asperger/detail_asperger.htm [hereinafter NINDS, *Fact Sheet*]. Persons with Asperger's Disorder often exhibit "socially and emotionally inappropriate behavior" and an "inability to interact successfully with peers." NINDS, *Fact Sheet, supra.* They have difficulty communicating with others and may not understand normal body language and gestures.' (*State v. Burr* (2008) 195 N.J. 119, 123, fn. 2.)" (*Larsen*, *supra*, 205 Cal.App.4th at p. 825, fn. 11.)

Defendant argues that the new evidence that she was diagnosed with Aspergers demonstrates that she is innocent of the sexual offense charges, to which she pled guilty. Defendant asserts that her capacity to initiate sexual acts with the boys or consent to them was highly unlikely because of her Aspergers disorder. The psychological evaluation

3

reports suggest that, because of Aspergers, she may not have understood that her conduct was wrong and was likely willing to do most anything that was asked of her, without putting up much of any resistance because of her passive nature and aversion to conflict.

It is incumbent upon the courts to be aware of and sensitive to the impact Aspergers can have on the conduct of those who suffer from Aspergers, and to take into account the disorder when appropriate. There is the tendency for society to overlook that individuals with Aspergers may function, act, and perceive things differently than those not suffering from the disorder, and may not have the mental capacity or understanding to enable them to say no to requests to do inappropriate and even criminal acts. It seems that Aspergers often has gone undiagnosed, especially in females, as was initially the case here. Although there may have been awareness of Aspergers in 2001, when defendant was charged with the sex offenses, there may have been less awareness and understanding of Aspergers than later on, when she was diagnosed with Aspergers in 2014.

While in the instant case I recognize that there is substantial evidence that defendant suffered from Aspergers and that the disorder may have hindered her ability to resist committing the sexual offenses with the boys, I nevertheless concur with the majority opinion that the trial court did not err in denying defendant's motion to vacate her convictions under Penal Code section 1473.7(a)(2). Defendant was convicted of 14 counts of committing sexual offenses against two boys in various locations, on separate occasions. Some of the sexual offenses were specific intent crimes (lewd and lascivious

4

acts with a child) and other offenses were general intent crimes (oral copulation and sodomy). (*People v. Warner* (2006) 39 Cal.4th 548, 557.) Lewd or lascivious conduct in violation of Penal Code section 288, subdivision (a), on the other hand, requires 'the *specific intent* of arousing, appealing to, or gratifying the lust of the child or the accused.' [Citation.]" (*Ibid.*)

Defendant argues her Aspergers diagnosis is new evidence showing she is innocent because she did not have the requisite specific intent to commit the lewd and lascivious crimes or the general intent crimes of sodomy and oral copulation. Defendant asserts the diagnosis explains why she did not fight off the boys and was incapable of fighting them off. In support of her motion to vacate, defendant submitted post-conviction psychological evaluation reports by Neuropsychologist Dr. La Sasso and Psychologist Dr. Leav, who diagnosed defendant with Aspergers. Defendant's Aspergers diagnosis was new but it was founded on the same facts, findings, and conclusions stated in Dr. Soorani's 2003 psychiatric evaluation report.

I also concur with the majority opinion that the diagnosis was discoverable with reasonable diligence before defendant pled guilty and was convicted of the sexual offenses. (*People v. Perez* (2020) 47 Cal.App.5th 994, 999 ["newly discovered evidence as testimony, writings and similar things described in Evidence Code section 140 (which defines 'evidence'), *discovered after trial or judgment, and that with reasonable diligence could not have been discovered earlier*"]; see *Estate of Thomas* (2004) 124 Cal.App.4th 711, 720; Pen. Code, § 1181, subd. 8; Pen. Code, § 1473, subd. (b)(3)(B)

5

["For purposes of this section, 'new evidence' means evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching"]; Pen. Code, § 1473.6, subd. (b) ["For purposes of this section, 'newly discovered evidence' is evidence that could not have been discovered with reasonable diligence prior to judgment"].)

The post-conviction expert reports submitted in support of defendant's motion to vacate her conviction merely added a new label for her behavioral and mental condition previously reported by mental health professionals. Drs. La Sasso and Leav's post-conviction reports diagnosing defendant with Aspergers merely corroborated pre-conviction expert evidence of defendant's behavioral and mental traits and provided a specific name or label for defendant's psychological condition.

In *Larsen*, *supra*, 205 Cal.App.4th 810, the defendant, who was convicted of murder, argued that "the trial court infringed on his constitutional right to present a defense based on his purported mental impairment caused by Asperger's Syndrome, and how it affected his perceptions and mental processes." (*Id*. at p. 822.) The defendant argued that the evidence of his mental disorder supported his defense and demonstrated he lacked the intent to kill. (*Ibid*.)

A defense expert in *Larsen*, who was a psychiatric physician's assistant, testified regarding defendant suffering from Aspergers. She stated that he "is socially naïve and is susceptible to manipulation by others. He can be influenced to say things against his own

6

interests that are consistent with his fantasies.  Because defendant has no social filter and always speaks what is on his mind, a clever person can manipulate him to act contrary to his own interests.  He also has a 'desire at any cost' to please others and give them 'something to get them to be his friends.'  He is thus easily manipulated.  He is prone to approach others to 'have his own needs met.'" (*Larsen*, *supra*, 205 Cal.App.4th at p. 822.)  The *Larsen* defendant argued the trial court infringed upon his right to present a mental impairment defense by refusing to give an instruction on the mental impairment defense (CALCRIM No. 3428).[2]  (*Ibid*.)

In *Larsen*, the expert also testified that the defendant was suffering from Aspergers at the time of the commission of the crime, thereby providing an evidentiary basis for the instruction on the mental impairment defense.  The expert testified that the defendant had been diagnosed with Aspergers and described defendant's disorder to include features pertinent to the defense to negate the intent element, including "his lack of social or mental filters," "inordinate desire to please others, [and] susceptibility to manipulation." (*Larsen*, *supra*, 205 Cal.App.4th at p. 826.)  The expert further testified

---

[2]  CALCRIM No. 3428 states in relevant part: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder).  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: *<insert specific intent or mental state required, e.g., 'malice aforethought,' . . . or 'knowledge that . . .'>*.  If the People have not met this burden, you must find the defendant not guilty of *<insert name of alleged offense>*."

that the defendant was "socially naïve and subject to manipulation by others to say things adverse to his own interests." (*Id*. at p. 826.)

The *Larsen* court concluded the expert's opinion testimony on the effects of Aspergers on defendant was probative and admissible on the issue of whether the defendant formed and expressed the requisite intent to procure the victim's murder. (*Larsen*, *supra*, 205 Cal.App.4th at p. 826.) The court in *Larsen* concluded that Aspergers is a recognized mental diagnosis that warranted a mental disorder instruction in the context of the charges of conspiracy and solicitation to commit murder charges, because proof of the specific intent to commit the underlying offense of murder was required. (*Id*. at p. 825.)

Justice Marchiano noted in his concurring and dissenting opinion in *Larsen* that, "[a]s judges know, evidence of mental disease, defect, or disorder is not admissible to negate the capacity to form any mental state, but is admissible solely on the issue of whether the defendant actually formed the required specific intent. With the abolishment of the diminished capacity defense in 1982 by Penal Code sections 25, 28, and 29, mental disorder or defect may no longer be used as a defense to a crime, but may be used to negate an element of the crime, such as specific intent. A defendant may show that because of Asperger's syndrome or any recognized mental disorder, he did not form the specific intent. . . ." (*Larsen*, *supra*, 205 Cal.App.4th at pp. 835-836.)

Justice Marchiano, however, added that simply because the defendant has the mental disorder of Aspergers or that persons with Aspergers are susceptible to

8

manipulation is not sufficient to warrant instructing on the mental impairment defense. (*Larsen*, *supra*, 205 Cal.App.4th at p. 836.) Susceptibility to manipulation does not necessarily negate the specific intent element. (*Ibid*.) This is because "Asperger's has varying symptoms and degrees of impairment, with many adults with Asperger's functioning successfully in society and engaging in purposeful activity. (See Asperger's in Adults http://www.aspergersinadults. net [as of Apr. 30, 2012].)" (*Ibid*.) The defendant's disorder must have in some way prevented him from forming and acting with the requisite criminal intent for the charged crime. (*Ibid*.)

In the instant case, the post-conviction Aspergers diagnosis evidence alone does not establish that defendant's disorder prevented her from forming and acting with the requisite criminal intent for the specific or general intent crimes. The underlying findings supporting the diagnosis may have been relevant but evidence of those facts and findings already existed before defendant's conviction and thus the new diagnosis did not constitute new evidence of innocence under Penal Code section 1473.7(a)(2).

I therefore concur with the majority opinion that the evidence of defendant's diagnosis was not "newly discovered evidence" within the meaning of Penal Code section 1473.7(a)(2) because, at the time of defendant's conviction, there was evidence from mental health professions, including from a psychologist and a psychiatrist, who evaluated defendant and reported that she suffered from the very behavioral and mental traits that typically manifest in those diagnosed with Aspergers. Such traits were the basis of defendant's defense when she pled guilty. Defendant's Aspergers diagnosis

9

added little, if anything, to the existing pre-conviction evidence provided by mental health professionals. As the trial court correctly concluded, the post-conviction Aspergers diagnosis merely provided a new label for what the mental health experts had already identified prior to defendant's conviction as the source of defendant's inappropriate behavior with the boys.

Furthermore, although Aspergers may have hindered defendant's ability to resist and repel the boys sexual advances and protect herself and her daughters, the Aspergers diagnosis alone does not establish her innocence any more so than the evidence existing at the time of defendant's conviction. There was pre-conviction evidence she repeatedly said no to the boys, but relented. There was also pre-conviction evidence provided by the mental health experts that defendant was passive, timid, nonassertive, and immobilized when afraid. In addition, there was evidence that, when the boys began forcing her to engage in sexual activities, they ignored defendant's pleas to stop, and she was ineffective in terminating the confrontation. The pre-conviction evidence demonstrated defendant may have lacked the ability to resist and may have felt compelled to react inappropriately by capitulating to the boys' sexual demands. The post-conviction evidence that defendant was diagnosed with Aspergers added little, if anything, to the existing evidence provided by mental health experts as to defendant's behavioral and mental traits upon which, later, other mental health experts concluded defendant suffered from Aspergers.

Evidence of the Aspergers diagnosis did not establish that defendant was incapable of avoiding committing the sexual offenses or that defendant did not have the requisite specific intent to commit the lewd and lascivious conduct offenses. There was even evidence to the contrary. Defendant pled guilty to committing numerous offenses (14 counts), committed on separate occasions. She also testified during the preliminary hearing that she was attracted to the boys and knew she should not commit the offenses, yet continued to do so. Arguably, her Aspergers disability made her more susceptible to being manipulated by the boys but the evidence of her Aspergers diagnosis, even in conjunction with the pre-conviction evidence, does not demonstrate innocence.

I concur in the affirmance of the trial court order denying defendant's motion to vacate defendant's conviction because defendant has not provided new evidence of actual innocence.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

11