Filed 12/20/23  P. v. Watkins CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JAMES THOMAS WATKINS,<br><br>　　　　Defendant and Appellant. | A165614<br><br>(Sonoma County<br>Super. Ct. No. SCR-743006-1) |

　　　　James Thomas Watkins (appellant) appeals his conviction, following a jury trial, for vehicular manslaughter (Pen. Code,[1] § 192, subd. (c)(1)), after he had a seizure while driving.  We affirm.

BACKGROUND

*2007–2017:  Epilepsy Diagnosis and Periodic Seizures*

　　　　In 2007, appellant was diagnosed with epilepsy.  In 2011, he underwent a lobectomy, a surgical procedure which removes brain tissue in an attempt to help prevent future seizures.  Lobectomies are generally performed only when the patient "is having a very hard time with seizures."

---

　　　　[1] All undesignated statutory references are to the Penal Code.

1

There are three categories of seizures, with different impacts on a person's ability to function. A simple partial seizure affects some aspect of brain function, such as speech, without affecting consciousness or awareness. Because there is no loss of consciousness or awareness, simple partial seizures are compatible with driving. A complex partial seizure involves only part of the brain, but by definition involves some loss of consciousness or awareness, such that the person is not fully alert. A loss of awareness is dangerous for driving. A generalized seizure affects the entire brain and results in convulsions and a loss of consciousness. After experiencing a seizure, a person will often be confused, disoriented, or demonstrate behavioral changes while the brain is returning back to its normal state. Sometimes a person does not remember having a seizure.

Dr. Jerry Schlegel, a general neurologist who treated patients with epilepsy, began treating appellant in June 2013. At that time, appellant was taking three "anticonvulsant" medications: lacosamide, topiramate, and clonazepam.[2] He reported having no seizures in the previous year.

In April 2014, appellant reported to Dr. Schlegel he was having simple partial seizures one to two times per month. According to Dr. Schlegel's notes, appellant stated he was "[s]till not driving" and would "continue to hold off on driving for now." Dr. Schlegel adjusted his medication to attempt to control the seizures. In September, appellant reported "nearly daily" simple partial seizures. Because of the continued increase in seizure activity, Dr. Schlegel referred appellant to Dr. Everett Austin, an epilepsy specialist.

---

[2] Lacosamide is also referred to as Vimpat; topiramate is also referred to as Topamax; and clonazepam is also referred to as Klonopin. To avoid confusion, we will use the terms lacosamide, topiramate, and clonazepam regardless of the term used in the testimony or documentary evidence being described.

Dr. Austin increased the dosage of one of appellant's medications. Two weeks later, appellant reported having only one seizure since the change in medication.

In April 2015, appellant was hospitalized following a generalized convulsive seizure. The treating emergency room doctor directed appellant not to drive until medically cleared to do so. The doctor also told appellant he would be reporting the seizure to the DMV (Department of Motor Vehicles). However, the DMV never received such a report and did not take any action on appellant's driving privileges. Appellant spoke with Dr. Austin shortly after the seizure. Dr. Austin reiterated that appellant could not drive until his seizures were under better control. Dr. Austin increased the dosage of one of appellant's medications to try to address future generalized seizures. Appellant reported that this change helped, reducing his seizures from generalized seizures to simple partial seizures.

In October 2017, appellant reported to a doctor that he had a possible seizure three months earlier where he " 'spaced out for a few seconds.' " Dr. Austin testified this description was consistent with a complex partial seizure during which the person is "not fully cognizant or conscious of what's going on around them."

*March 2018 Traffic Collision*

In March 2018, appellant was involved in a traffic collision. Jason Sargis was in heavy traffic on U.S. Highway 101 when appellant drove up behind him at a high rate of speed and hit him multiple times. Sargis could see that appellant was slouched down and looked "a little . . . off." Appellant eventually hit a guardrail, drove off the road, went through a fence, and stopped in a field. Sargis called 911 and went to check on appellant. Appellant's car was heavily damaged, and bystanders had to break a window

3

to get appellant out. Appellant apologized for hitting Sargis's car and was smiling and "acting like he didn't just crash his car."

California Highway Patrol Officer Shawn Harvey responded to the scene about ten minutes after the crash. Appellant seemed confused and disoriented, giving nonresponsive answers to the officer's questions. For example, when asked what lane he was traveling in, appellant responded that his car was a 2017 model; when asked how fast he was going, appellant responded that his car was blue. Appellant was slurring his words, had difficulty walking and standing, and had a delayed response to the officer's questions. Appellant told the officer he had a seizure disorder but was "adamant" that he had not had a seizure before the crash. A blood sample taken that day tested negative for any central nervous system depressants.

Dr. Austin testified that a person with a long-term seizure disorder who was involved in this kind of accident should deduce that they may have had a seizure.

*2018–2019 Representations to Doctors and the DMV*

In February 2018, the month before the traffic collision, appellant represented on his driver's license application form that he had no medical conditions in the last three years affecting his ability to drive. A DMV safety officer testified epilepsy is such a medical condition and when a person informs the DMV of an epilepsy diagnosis, the DMV requires a medical evaluation before issuing a driver's license.

In April 2018, the month after the collision, appellant told his primary care physician, Dr. Jack Nadler, that he had not had a seizure in more than two years. At appellant's request, Dr. Nadler provided him with a note for work stating that he could work and drive. Appellant did not tell Dr. Nadler about his recent traffic collision, and Dr. Nadler testified he would have

4

wanted to know "if there were any car accidents that could be related to a medical issue." Dr. Jonathan Artz, a general neurologist, began treating appellant around the same time, and appellant told Dr. Artz his last seizure was more than three years ago. In December 2018, appellant reported to Dr. Nadler he had no seizures in approximately five years and requested Dr. Nadler complete a DMV form so stating on his behalf.

In March 2019, appellant participated in a DMV hearing regarding the March 2018 collision.[3] The hearing officer stated he had Dr. Nadler's December 2018 medical evaluation form stating appellant had not had a seizure in more than five years.[4] Appellant, who was under oath, stated that information was correct. Appellant said the March 2018 collision was caused by another car forcing him off the side of the road during heavy rush hour traffic: "The cars just kind of brought me up slowed up slowed [*sic*] and just kind of worked me over off to the side." He stated he was taking lacosamide, topiramate, and clonazepam for seizures; took them as prescribed; and experienced no side effects from the medications. Based on the medical evaluation form and appellant's representations in the hearing, the hearing officer determined appellant's license would remain valid.

*September 9, 2020 Fatality*

On September 9, 2020, as a car that Samantha Semoril was riding in approached a roundabout, a Prius passed them by veering up onto the sidewalk. Moments later, Semoril heard a huge bang and saw a trash can fly

---

[3] A recording of the proceeding was admitted into evidence at trial and a transcript was provided.

[4] Although the transcript identifies the date of the form as December 2019, this is either a misstatement by the hearing officer or a mistranscription, as the DMV hearing was held in March 2019.

through the air.  A person was lying in the middle of the road by the roundabout.  Appellant stumbled out of the Prius and appeared to be drunk.  The person appellant hit, Mario Armando Castaneda, died from his injuries.

Sonoma County Sheriff's Deputy Robert Sutherland responded to the scene.  When he approached appellant, appellant promptly claimed responsibility for the accident.  Appellant was lethargic and off balance, staggering as he walked and speaking in a slightly slurred manner.  He was confused and behaving oddly, unable to give his date of birth, unable to find his wallet even though it was located in his front pants pocket, and giving unintelligible and nonsensical responses such as pointing to the sky or saying, "whoop whoop whoop."  Appellant told Sutherland he was not epileptic and was not taking any prescription medications.

A blood sample taken about two hours after the crash showed a therapeutic level of topiramate, a low level of lacosamide, and no clonazepam.  No alcohol or other drugs were present.  At the time of the accident, appellant was prescribed daily doses of topiramate, lacosamide, and clonazepam.  The prescribed dose of lacosamide was somewhat high and appellant was supposed to take clonazepam twice per day.  Dr. Artz testified that if a patient has a very low level or no detectable level of a drug in their system, it likely means they were not taking the medication consistently, which would increase their risk of seizures.  Because clonazepam stays in the body for a while, the absence of any in appellant's blood test indicates he "wasn't probably taking it consistently or maybe not taking it at all.  If it's nondetectable, . . . I would suggest that he probably wasn't taking it recently," which could cause a seizure.

Appellant told Dr. Artz that the September 2020 crash was caused by a seizure.  He also said he had not missed any of his three medications.  An

6

inspection revealed that there were no mechanical problems with the car that would have caused the collision.

*Verdict and Sentence*

The jury found appellant guilty of vehicular manslaughter and found true an enhancement for personal infliction of great bodily injury (§§ 667, 1192.7). The jury found not true an allegation that the victim was particularly vulnerable. The court sentenced appellant to four years in state prison.

DISCUSSION

I. *Substantial Evidence*

Appellant argues there was insufficient evidence to support the jury's verdict that he was grossly negligent. We disagree.

" 'When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' [Citation.] In doing so, we 'view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.' [Citation.] 'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

7

The jury was instructed, "*Gross negligence* involves more than ordinary carelessness, inattention, or mistake in judgment.  A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from how an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act."  (See CALCRIM No. 592.)

Appellant points to testimony from doctors that, as a general matter, driving is permitted if a person has been seizure-free for six months or a year, and that the DMV usually requires a 90-day seizure-free period before granting permission to drive.  He argues that, because there is no evidence he had a seizure in the year before the incident, it was not grossly negligent for him to drive.

The issue is not quite so simple, particularly if a person had a seizure while on anticonvulsant medication.  As Dr. Austin explained, in such cases the mere passage of time is insufficient.  Instead, he would work with the patient to determine if there "could . . . be any explanation for [the seizure].  Is it because you didn't get enough sleep?  Is it because you missed your medicine?  And you know we usually get drug levels in the emergency room because sometimes people say oh I didn't miss my medicine, but the level is zero.  And we say well you did miss your medicine and that's why you had your seizure.  So we need to get on the program and get you taking your medicine so your levels in your blood are normal.  I mean that's an example of how we go through this process, try to find is there some way, some reason that a seizure was triggered by circumstances.  And if there wasn't then

8

really we have to assume that the seizures are not being well controlled by the current treatment and make some changes in the treatment to get better control. And that usually means either more medicine, try a different medicine or add another medicine." Similarly, Dr. Schlegel testified he did not have an "affixed seizure-free interval" to determine when a person is safe to drive, instead, the determination depends on the specific circumstances: "If I could reasonably expect that seizures are not going to recur, if their cause was removed or if there had been definitive treatment or if the antiepileptic drug regimen had been stable for quite sometime or if the seizures themselves were not threatening. All those factors would be in my mind if I were to write in support of driving."

The jury could have found: (1) appellant knew the March 2018 car crash was caused by a seizure but he actively concealed this from his doctors and from the DMV in order to keep driving; (2) a reasonable person in appellant's position would know that a doctor needed to make the case-specific determination of whether and/or when it was safe for him to drive; (3) appellant was not properly taking his seizure medications yet continued to drive; and (4) a reasonable person in appellant's position would know that the failure to be consistent with such medications can lead to seizures.[5] Substantial evidence supports the jury's finding of gross negligence.

---

[5] Appellant argues the absence of recent seizures shows "appellant's medications were working, and the serious seizures were under control, even if he was not taking the prescribed dose." But there is no evidence appellant had been taking the wrong dose of his medications over a significant period of time. To the contrary, appellant consistently represented he was taking his medications as prescribed, even after the September 2020 seizure. The jury could reasonably conclude that appellant had recently stopped taking his medications as prescribed.

II.    *Unconsciousness Instruction*

Appellant contends the trial court erred in refusing to instruct the jury on unconsciousness pursuant to CALCRIM No. 3425, which provides, in relevant part, "The defendant is not guilty of <insert crime[s]> if (he/she) acted while unconscious.  Someone is unconscious when he or she is not conscious of his or her actions.  [Someone may be unconscious even though able to move.] [¶] Unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/ [or] involuntary intoxication[,]/ [or] <insert a similar condition>)."  We disagree.

" 'The trial court has an "obligation to instruct on defenses, . . . and on the relationship of these defenses to the elements of the charged offense . . ." where "[¶] . . . it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense . . . ." [Citations.]' [Citation.]  But, the court must 'give a requested instruction concerning a defense only if there is substantial evidence to support the defense.' [Citations.]  '[A] trial judge must only give those instructions which are supported by substantial evidence,' and 'has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.' " (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.)

Appellant's argument is that he was unconscious at the time he struck Castaneda.  As the People argue, the relevant act was not losing control of his vehicle, but rather deciding to drive knowing that his seizure disorder was not fully controlled.[6]  There was no evidence that appellant was unconscious at the time of this act.

_____

[6] In his reply brief, appellant argues this was merely the prosecution's theory.  But this was the act at issue before the jury.  The jury was instructed the prosecution must prove:  "1. The defendant drove a vehicle; [¶] 2. While driving that vehicle, the defendant was *driving with a seizure disorder*; [¶]

10

## DISPOSITION

The judgment is affirmed.

---

3. The defendant committed the otherwise lawful act with gross negligence." (Italics added.) Similarly, in the instructions for the lesser included offense of misdemeanor vehicular manslaughter (§ 192, subd. (c)(2)), the jury was instructed, "The People allege that the defendant committed the following otherwise lawful act with ordinary negligence: *driving a vehicle with a seizure disorder.*" (Italics added.) The parties' closing arguments reflected this instruction. The prosecutor argued, "[Castaneda] was struck and killed because of the defendant's choices to drive when he knew he had this condition." Defense counsel argued, "[A] person with a seizure condition can drive if licensed. It is not grossly negligent if you are allowed to drive. DMV said you could drive. The doctors said you can drive. He's reporting everything that he knows is happening to him. That's not being grossly negligent. That's not anything that a reasonable person wouldn't be doing." Appellant's unconsciousness at the time he lost control of his vehicle was not a defense to the charged crime.

11

SIMONS, J.

WE CONCUR:

JACKSON, P. J.

CHOU, J.

A165614
*People v. Watkins*